ESTATE OF LOTA C. MUNDY, DECEASED, PALMER FIRST NATIONAL BANK AND TRUST COMPANY OF SARASOTA, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Mundy v. Commissioner
Docket No. 6392-74.
United States Tax Court
T.C. Memo 1976-395; 1976 Tax Ct. Memo LEXIS 8; 35 T.C.M. (CCH) 1778; T.C.M. (RIA) 760395; December 27, 1976, Filed George W. Ericksen, for the petitioner. Gerald W. Hartley, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the Federal estate tax of the Estate of Lota C. Mundy, deceased, Palmer First National Bank and Trust Company, executor, in the amount of $850,907.11. The only issue for decision is the fair market value of certain corporate stock owned by decedent at her death. In connection with this determination, we must decide the effect on the value, if any, of certain redemption provisions found in the certificate of incorporation.
*10 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Palmer First National Bank and Trust Company of Sarasota, as executor of the Estate of Lota C. Mundy, timely filed a Federal estate tax return with the Director, Internal Revnue Service Center, Chamblee, Georgia on July 7, 1971. The executor's principal place of business was located in Sarasota, Florida at the time the petition in this case was filed. The decedent, Lota C. Mundy, died testate on March 30, 1970. She was the widow of Harry L. Mundy (Mr. Mundy), who died February 7, 1962, and she was survived by three children, Anne Mundy Lazareff, Guthrie Mundy, and Harry L. Mundy, Jr. These children were born in 1912, 1913, and 1914, respectively. Guthrie Mundy suffered brain damage at birth and has required care and supervision throughout his life. At the time of her death, decedent owned, among her other assets, 77 shares of Class A stock and 6 shares of Class B stock in the Lota Company. The 77 shares of Class A common stock, which she had received from her husband on his death, were still held by the estate of Harry L. Mundy but were under an order of distribution to decedent. The *11 decedent's estate later received the 77 shares in a distribution from her husband's estate. The Lota Company was a Florida corporation organized to do business in 1937. It was established in a reorganization in which substantially all the assets of a Minnesota corporation, the Lundi Company, were transferred to it. The Lundi Company had been organized by the decedent's husband on October 31, 1930. At all times the capital structure of the Lota Company and restrictions on its stock were set forth, in pertinent part, in the articles of incorporation as follows: III. The amount of capital stock of the corporation shall consist of one thousand (1,000) shares, of which two hundred (200) shares without par value shall be known as Class A common stock and eight hundred (800) shares without par value shall be known as Class B common stock. CLASS A COMMON STOCK
1. Class A Common Stock shall be entitled to receive as dividends each year the net earnings of the corporation; said earnings to be distributed as dividends upon the Class A stock from time to time during the said current year as the Board of Directors shall deem wise and advisable. 2. Class A Common Stock shall *12 have exclusive voting power in the affairs of the corporation. 3. Class A Common Stock shall be subject to fetirement by vote of the Board of Directors in whole or in part forty-five (45) days written notice having been given as hereinafter provided at Five Hundred Dollars ($500.00) per share, plus unpaid dividends for current year. If less than all the outstanding Class A Common Stock is called for retirement, the manner of selecting the stock to be retired shall be determined by the Board of Directors. Notice of Retirement of any Class A Common Stock shall be given by registered mail to the registered holder thereof, addressed to him at his address as the same appears on the transfer books of the corporation, at least forty-five (45) days prior to date of retirement. Such notice having been given and the funds for the retirement of such stock being in the hands of the Harris Trust & Savings Bank, Chicago, Illinois, or any successor institution, all the rights and privileges of the stock so called for retirement including the right to vote and receive dividends thereon shall cease as of the date fixed for the retirement of said stock. 4. Upon dissolution or liquidation of *13 the corporation, Class A Common Stock shall be entitled to receive Five Hundred Dollars ($500.00) per share with unpaid dividends thereon to date of payment before the Class B Common Stock shall receive anything, and thereafter shall have no further interest in the assets of the corporation. CLASS B COMMON STOCK
1. Class B Common Stock, after retirement of the Class A Common Stock, shall be entitled to such dividends as may be declared from time to time by the Board of Directors of the corporation out of the corporation's surplus or net profits, or out of its assets in excess of its capital. 2. Class B Common Stock, after retirement of Class A Common Stock, shall be entitled to the exclusive voting power in the affairs of the corporation. 3. Class B Common Stock, after retirement of the Class A Common Stock or upon payment of Five Hundred Dollars ($500.00) per share, and dividends thereon in case of dissolution or liquidation of the corporation, shall be entitled to participate in all other assets of the corporation applicable to capital stock. Capital Stock of the corporation shall be issued for such consideration as may from time to time be fixed by the Board *14 of Directors of the Corporation, and which said capital stock shall be sold, issued, transferred, assigned or otherwise disposed of in accordance with the by-laws of this corporation as the same will from time to time be made, changed or altered, with a lien reserved in favor of said corporation upon all said stock for any indebtedness which may, from time to time, up to such delivery of said stock, be due from the holder or holders of same to the corporation, and all transfers, sales or assignments of said stock shall be subject thereto. * * *
XII. In case any of the Class A Common Stock of this corporation is transferred to third parties, the corporation shall have the option (to be exercised by majority vote of the Class B Stock) to purchase or retire said Class A Stock on the terms and conditions hereinbefore set forth. In case any of the Class B Stock of this corporation is offered for sale or sold directly or indirectly or transferred, other than by the law of descent or by will, the corporation shall, upon receiving notice of the facts relating thereto, have for a period of sixty (60) days thereafter the first right and option to purchase such stock, the purchase *15 price to be the book value thereof as disclosed by the books of the corporation at the end of the preceding fiscal year. These provisions were essentially the same as those found in the articles of incorporation of Lota Company's predecessor, the Lundi Company. The stock certificates for the Class A shares of Lota Company stock carried the following legend: The rights, privileges and restrictions enuring to the benefit of or placed upon the Class A Common Capital Stock are set forth in the Certificate of Incorporation, reference to which is hereby made. The certificates for the Class B stock carried a similar legend referring to the restrictions upon that class of stock. Harry L. Mundy, the decedent's husband, was a heavy construction contractor and was involved in the building of some of the early railroads in the United States before 1929. About the time of the Depression, he went into other forms of construction and was involved in the building of the Shasta Dam, the Cascade Tunnel, the Allegheny Highway, a number of other highways, some of the levees on the Mississippi River and mining operations in northern Minnesota. About 1943 Mr. Mundy retired to Florida. *16 On July 22, 1915, Harry L. Mundy and Charles Ffolliott had formed Ffolliott & Mundy, Inc., a Minnesota corporation, to hold various investments in securities belonging to them. Ffolliott died in 1930, and Ffolliott and Mundy, Inc. was liquidated. On October 31, 1930, Harry L. Mundy formed the Lundi Company, a Minnesota corporation, with substantially the same assets he received in the Ffolliott and Mundy, Inc. liquidation. The assets transferred to the Lundi Company were taken on its books at a value of $455,572.85. The assets transferred are listed below: Number of Indicated Shares
Issue Book Value
143
Brooks-Scanlon-O'Brien
$ 12,155.00
Co., Ltd.
40
Colorado & Southern Ry.)
1st pfd.)
60
Colorado & Southern Ry.)
2nd pfd.)
8,152.50
40
Union Securities Co.
4,000.00
4
Provident Loan Society
100.00
35
Old National Corporation)
Class A)
13
Old National Corporation)
Class B)
473.33
29
Cities Service Co., 6% pfd.
2,112.19
15
Northern Pacific Ry.
1,293.00
2,071
A. Guthrie & Co., Inc., pfd.
207,100.00
126
Curtiss-Wright Corp.)
Common)
28
Curtiss-Wright Corp.)
Class A)
591.17
501
Midland United Company
11,519.22
120
F-M-L Holding Co.
18,812.02
Notes Receivable - H.L. Mundy
189,264.42
*17 On January 2, 1931, the Lundi Company purchased additional securities of 21 issuers for $128,632.75. These securities were purchased through Harry L. Mundy's brokerage account. The assets received by Mr. Mundy from the liquidation of Ffolliott and Mundy, Inc. were transferred to the Lundi Company in exchange for 200 shares of Class A stock and 200 shares of Class B stock of the company. On December 2, 1930, the stockholders of the Lundi Company were as follows: Shares
Class A Common Stock
Harry L. Mundy
200
Class B Common Stock
Harry L. Mundy
200
Lota C. Mundy
1
George M. Sausen [1]
1
On December 1, 1931, Harry L. Mundy created the Harry *18 L. Mundy Trust No. 1. The corpus of the trust was 99 shares of Lundi Company Class A stock previously held by Harry L. Mundy individually. Harry L. Mundy was the initial trustee and served until July 10, 1950, when the decedent herein became trustee. Before her death, however, the decedent resigned and Harry L. Mundy, Jr., Anne Mundy Lazareff, and Palmer First National Bank & Trust Co., the executor herein, were appointed cotrustees.The beneficiaries under the trust and their proportionate shares were as follows: Lota C. Mundy
49/99
Anne Mundy Lazareff
25/99
Harry L. Mundy, Jr.
25/99
Although it initially required mandatory distribution of income, on August 1, 1941, the trust was amended to allow the accumulation of income in the discretion of the trustee. At first the trust provided for termination at the earlier of the dates of the death of Harry L. Mundy or the decedent. As finally amended however, the trust terminated upon the death of the decedent and all principal and accrued income passed to the Harry L. Mundy Trust No. 2. On January 28, 1932, Harry L. Mundy created the Harry L. Mundy Trust No. 2, the corpus of which was 715 shares of Lundi Company *19 Class B stock previously held by Harry L. Mundy individually. Harry L. Mundy was named the initial trustee; however, on November 10, 1945, Harry L. Mundy resigned and the trustees named were the decedent, Harry L. Mundy, Jr., and the executor in this case. As first established, the trust provided for mandatory distribution of net income to the decedent until her death or remarriage and then to the decedent's three children in equal shares. However, on September 7, 1946, the beneficiaries granted to the decedent a limited power of appointment stating: During her lifetime, Lota C. Mundy, wife of the donor, is hereby given a limited power of appointment to designate the beneficiaries of the trust and their interest in and to the trust estate, principal and income; provided, however, (a) no such designation shall have the effect of increasing or altering or changing the interest of the said Lota C. Mundy in and to the trust estate, principal or income; and (b) no one shall be designated a beneficiary of the trust or to have an interest in the income or principal thereof under this limited power of appointment except descendants of the donor of the first or succeeding generations and *20 spouses of such descendants. On March 29, 1962, decedent, acting under her power of appointment, amended the trust to provide that after her death the trust would continue for the benefit of the following persons and their descendants in the following shares: Harry L. Mundy, Jr.
4/12
Anne Mundy Lazareff
3/12
Harry L. Mundy III (decedent's
grandson)
3/12
Guthrie Mundy
2/12
On May 27, 1933, Harry L. Mundy created the Harry L. Mundy Trust No. 3. The corpus of this trust was 75 shares of Lundi Company Class A stock which Harry L. Mundy had previously held individually. The decedent was the beneficiary of this trust, and her husband the trustee. Harry L. Mundy had the power to accumulate the income of the trust or pay it out. The trust terminated on the earlier of the dates of death of Harry L. Mundy or the decedent, and the corpus reverted to Harry L. Mundy or his estate at that time. In fact, the trust terminated on Harry L. Mundy's death, and the 75 shares of stock reverted to his estate. The trustees of each of the three trusts above had the power to vote the stock held by them. After the various issuances and transfers from 1930 through 1933, *21 the stock of the Lundi Company was held as follows during the period from 1933 until it was exchanged for stock of the Lota Company in 1937: Shares
Class A Common Stock
Harry L. Mundy
26
Harry L. Mundy, as Trustee under
Trust No. 1
99
Harry L. Mundy, as Trustee under
Trust No. 3
75
200
Class B Common Stock
Harry L. Mundy, as Trustee under
Trust No. 2
715
Lota C. Mundy
1
George M. Sausen
1
717
By resolutions of the boards of directors of Lota Company and Lundi Company as of April 28, 1937, the assets of the Lundi Company were exchanged for stock of the Lota Company. The shares of Lota Company received by Lundi Company were then distributed to the Lundi Company shareholders. The following reflects the stock ownership of the Lota Company following the reorganization and continuing to the time of Harry L. Mundy's death in 1962: Shares
Class A Common Stock
Harry L. Mundy
26
Harry L. Mundy as Trustee of
Trust No. 3
75
Trustee of Trust No. 1 (Harry L.
Mundy until July 10, 1950; then
the decedent)
99
200
Class B Common Stock
Trustee of Trust No. 2 (Harry Mundy
until November 10, 1945; then
Lota Mundy, Harry L. Mundy, Jr.,
and one of two banks)
715
Harry L. Mundy
2
Lota C. Mundy
6
George M. Sausen
2
725
*22 Harry L. Mundy died on February 7, 1962. One hundred and one shares of the Class A stock of the Lota Company were included in his estate for estate tax purposes, and on August 17, 1962, the board of directors of the Lota Company redeemed the 101 shares for $500 per share. A value of $500 per share for this stock was reported on the estate tax return of the estate of Harry L. Mundy. The Internal Revenue Service mailed a notice of deficiency to the Estate of Harry L. Mundy on March 22, 1966, asserting a deficiency in Federal estate tax of $927,804.29.The deficiency was determined to result from an undervaluation of the Class A stock of Lota Company owned by Harry L. Mundy at his death. The estate filed a petition with this Court. The case was settled, however, and a stipulated decision was entered on September 18, 1967, determining a deficiency of $376,534.27 against the estate. The parties had agreed for purposes of this settlement to a value of $24,420 per share of Lota Company Class A stock and $1 per share of Lota Company Class B stock. On June 18, 1968, the Internal Revenue Service mailed to Lota C. Mundy a notice of deficiency in Federal gift taxes of $1,232,966.26. *23 The basis of this asserted deficiency was the redemption of the Lota Company Class A stock for a price alleged to be less than its fair market value which benefited the beneficiaries of the Harry L. Mundy Trust No. 1. Lota C. Mundy filed a petition in this Court contesting the deficiency, but a settlement was reached between the parties. A stipulated decision determining a deficiency of $2,806.87 was entered by this Court on May 28, 1969. On March 27, 1967, the Estate of Harry L. Mundy brought suit to set aside the redemption of the 101 shares of stock. The redemption was set aside by the Circuit Court of Sarasota County, Florida on June 7, 1967, and the estate was ordered to repay to the Lota Company the $50,500 it had received. The Court explained its decision in part as follows: 1. Subsequent to the retirement, on or about August 17, 1962, of the 101 Class A Common Stock of The Lota Company, owned by the Estate of Harry L. Mundy, there supervened an event which completely frustrated the purposes of the retirement. 2. As no party to the retirement did anticipate, or might properly have anticipated, the assertion by the Federal Government of any gift tax liability as *24 a result of such an event, neither party to the retirement intended that the other should assume the risk of its occurrence; nor did either party intend that Mrs. Mundy should assume such a risk. After the original redemption was set aside and after the entry of decision by the Tax Court pursuant to stipulation of the parties of a deficiency in estate tax of the Estate of Harry L. Mundy, the Lota Company redeemed 24 shares of Class A stock held by the estate. The redemption price was $24,420 per share, the value which formed the basis of settlement of the Tax Court case. About 1950, the Lota Company had established a custodial agency account for its assets with the Palmer First National Bank and Trust Company of Sarasota, Florida. In this capacity the bank managed the assets and collected the dividends, but it provided no investment advice or investment services. The bank began providing investment advice and services to the corporation about 1960 and continued to do so until after decedent's death in 1970. In 1966 the investment policy of the Lota Company was changed. The purpose and result of the change was to convert some "growth" type securities to "income" type securities. *25 The request for increased income came principally from Lota C. Mundy and was made because of special needs resulting from extraordinary medical expenses for herself and her grandson and expenses of caring for one of her sons. As a result of the sale of securities, the Lota Company realized a capital gain in 1966 of $2,241,353.56, on which it paid Federal income tax.
In 1968 a similar change was put in effect on a smaller scale. As a result of the sale of securities in that year, the Lota Company realized a capital gain in 1968 of $1,098,323.48, on which it paid Federal income tax. The majority of the securities held by the Lota Company on March 30, 1970, were income stocks, but it also held a large number of growth securities. The decedent held 77 shares of Class A stock and 6 shares of Class B stock of the Lota Company at the time of her death on March 30, 1970. The following schedule shows the complete stockholdings in the Lota Company on that date: Shares
Class A Common Stock
Lota Mundy n( a )
77
Harry Mundy Trust No. 1 n( b )
99
176
Class B Common Stock
Harry Mundy Trust No. 2 n( c )
715
Lota C. Mundy
6
G. M. Sausen
2
Decedent's Son (Harry Jr.)
1
Decedent's Daughter (Anne)
1
725
*26 The following reflects the balance sheet of the Lota Company on March 30, 1970, with assets valued at their then current market value: Assets
Current Assets (Cash, Inter-
est & Dividends Receivable)
$ 47,597.42
Common Stocks
3,041,074.84
Preferred Stocks
1,148,754.26
Promissory Note
94,003.04
Corporate Bonds
6,900.00
U.S. Treasury Notes
49,120.00
U.S. Treasury Bills
24,708.86
TOTAL ASSETS
$4,412,158.42
Liabilities
Current Liabilities
6,169.87
Capital Stock
$ 665,517.60
Retained Earnings and
increase in equity
due to valuing assets
at fair market value
as opposed to costs
3,740,470.95
4,405,988.55
TOTAL LIABILITIES AND
STOCKHOLDERS EQUITY
$4,412,158.42 The book value of the securities listed above was $2,684,104.67 on March 30, 1970, indicating an unrealized appreciation in assets of $1,728,053.75. *27 Under section III of the Certificate of Incorporation of the Lota Company, previously set forth, the corporation was required to pay as dividends in the current year the "net earnings" of the corporation. The dividends actually declared and paid per share of outstanding Class A stock of the Lundi Company and the Lota Company during the period December 31, 1931 through February 2, 1970, were as follows: THE LUNDI COMPANY Date Declared
Amount Per Share
Outstanding Shares
12/31/31
$ 260.00
200
6/5/33
150.00
200
21/26/34
85.00
200
12/30/35
140.00
200
12/30/36
290.00
200
12/20/37
230.00
200
THE LOTA COMPANY
12/31/37
$ 400.00
200
12/22/38
200.00
200
12/20/39
203.50
200
12/16/40
212.50
200
12/30/41
281.00
200
11/20/42
228.00
200
6/15/43
2 1/2 shares
Dodge Corp.
200
11/16/43
132.50
200
5/26/44
1.09 shares
200
Allied Stores
Pref.
11/6/44
149.50
200
1/3/45
1 share Cuban
200
Atlantic Sugar Co.
1 share West
200
Indies Sugar Co.
1/2 share Lowe's
200
Inc.
10/23/45
146.50
200
9/25/46
281.50
200
11/27/46
1 share Bond
200
Stores, Inc.
1/2 share
200
Federated Dept.
Stores
2/4/47
1/2 share
United Fruit
200
4/26/47
1/2 share
200
Wesson Oil &
Snowdrift
9/24/47
$ 215.00
200
12/13/48
297.25
200
12/19/49
200.00
200
12/12/50
342.50
200
12/10/51
348.00
200
12/22/52
344.00
200 12/22/53
361.50
200
2/10/54
6.00
200
12/10/54
363.00
200
2/14/55
8.00 200
3/14/55
21.00
200
12/12/55
380.00
200
12/10/56
445.00
200
1/21/57
10.00
200
12/9/57
455.00
200
12/18/58
415.00
200
12/17/59
$ 445.00
200
12/17/60
470.00
200
11/1/61
450.00
200
2/19/62
25.00
200
12/21/62
2,500.00
99 [2]
4/4/63
750.00
99
11/6/63
825.00
99
4/7/64
600.00
99
10/6/64
600.00
99
1/25/65
400.00
9 9
4/16/65
350.00
99
11/9/65
700.00
99
1/24/66
350.00
99
4/4/66
400.00
99
6/11/66
325.00
99
10/1/66
550.00
99
12/8/66
350.00
99
2/20/67
400.00
9
8/11/67
550.00
200
12/4/67
$ 425.00
176
3/4/68
200.00
176
6/17/68
325.00
176
10/7/68
340.00
176
12/14/68
175.00
176
3/15/69
285.00
176
6/14/69
385.00
176
9/20/69
340.00
176
12/12/69
240.00
176
12/12/69
2.4 shares Control
176
Data Corporation
2/2/70
190.00
176
2/2/70
3 shares Florida
176
Power & Light Corp.
2/2/70
2 shares 3M Company
176
2/2/70
8 shares St. Paul
176
Companies, Inc.
2/2/70
9 shares Whirlpool
176
Corporation
2/2/70
3 shares Buffalo
176
Forge
*28 On the Federal estate tax return filed for decedent's estate, the 77 shares of Class A stock of the Lota Company owned by decedent were valued at $500 per share and the 6 shares of Class B stock at $5,956 per share. In his notice of deficiency, respondent determined that the proper value for these shares was $25,000 per share of Class A stock and $1 per share of Class B stock.
OPINION The parties have stipulated that 77 shares of Class A stock and 6 shares of Class B stock of the Lota Company are included in the gross estate of Lota C. Mundy pursuant to section 2033, I.R.C. 1954. [3] This section provides: SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST. The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death. *29 The disagreement of the parties is as to the value of the stock of Lota Company held by decedent at the date of her death. The major argument of the parties concerns the effect on the value of this stock of the redemption provisions found in the Certificate of Incorporation. It is principally the effect or lack of effect of these provisions that causes the parties to contend for such widely disparate values as $1,024.63 and $25,000 per share for the Class A stock and $4,386.03 and $1 per share for the Class B stock. The provisions of sections III and XII of the Certificate of Incorporation, quoted fully in our Findings of Fact, allowed redemption of the Class A stock of the Lota Company in two circumstances. First, the Class A stock, or any part of it, could be redeemed by a vote of the board of directors, presumably at any time. Second, where any Class A stock was transferred to "third parties," that particular stock could be redeemed upon an affirmative vote by the holders of a majority of the Class B stock. The redemption price in each case was $500 per share plus unpaid dividends. Under these provisions, the Class A stock was entitled to only $500 per share plus unpaid dividends *30 on liquidation or dissolution of the corporation. Petitioner takes the position that these provisions effectively limit the fair market value of the Class A stock to the redemption price provided for in the corporate charter, arguing in essence that no sale to a willing buyer would ever take place at a price in excess of $500 per share plus unpaid dividends. Respondent counters that the provisions have no effect at all on the fair market value of the stock. Respondent first argues that the stock redemption agreement in the Certificate of Incorporation of the Lota Company is invalid and unenforceable under state law. The parties agree that the law of Florida is controlling as to the validity of these redemption provisions. Florida has adopted a version of the Uniform Commercial Code, which became effective on January 1, 1967. Under the provisions of the Uniform Commercial Code as adopted by the State of Florida, restrictions on the transfer of securities are limited. The Florida statutes state that "[unless] noted conspicuously on the security a restriction on transfer imposed by the issuer even though otherwise lawful is ineffective except against a person with actual knowledge *31 of it." Fla. Stat. Ann. sec. 678.204 (1966). Respondent asserts that the provisions in the Certificate of Incorporation are restrictions on transfer and that they are not "noted conspicuously." We do not agree with respondent's contention. Assuming that these provisions create a restriction on transfer bringing the above statute into play, we find that the rights of the corporation in this instance are "noted conspicuously" on the certificates of shares and that the statute, if applicable, would be satisfied.
The relevant Florida statute states in part that "[a] term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." Fla. Stat. Ann. sec. 671.201(10) (1966).The certificates in the instant case bore the following typed legend on their face: The rights, privileges and restrictions enuring to the benefit of or placed upon the Class A Common Capital Stock are set forth in the Certificate of Incorporation, reference to which is hereby made. Whatever the effect of this legend, we believe that any purchaser of the shares should have noticed it and that the legend was therefore *32 "conspicuous." We further find that the legend itself was a notation of the corporation's rights sufficient to satisfy the statute. The present statute superseded Fla. Laws 1943, c. 21894, sec. 17, formerly Fla. Stat. Ann. sec. 614.17 (1955), which provided: No lien or restriction unless indicated on certificate. There shall be no lien in favor of a corporation upon the shares represented by a certificate issued by such corporation and there shall be no restriction upon the transfer of shares so represented by virtue of any by-laws of such corporation, or otherwise, unless the right of the corporation to suc lien or the restriction is stated upon the certificate. This prior statute, which on its face might seem to require a full recitation of the restriction on the certificate, was more liberally construed in Weissman v. Lincoln Corp., 76 So. 2d 478 (Fla. 1954). The Supreme Court of Florida there considered the validity of a shareholders' agreement granting a right of first refusal to certain shareholders. Such an agreement was authorized by the articles of incorporation and by-laws, and the share certificates bore the following legend: The original of this *33 stock is subject in all respects to the terms of a stockholders' agreement made under date of March 13, 1946, the text of which is included among the minutes of the meeting of the Board of Directors and Stockholders held on March 13, 1946, and all persons to whom these presents may come are referred to the said minutes for the text of said stockholders' agreement. The Court held that this legend put a purchaser, without notice of the agreement other than the legend, on notice of the agreement and bound him by it. The above legend, held sufficient to place a purchaser on notice, does not differ in essentials from that evident on the face of the certificates in the instant case. The legend in Weissman was longer and thus more conspicuous, but this was necessary because reference was made there to a shareholders' agreement rather than, as here, to the Certificate of Incorporation, which was a matter of public record on file with the Florida Secretary of State. See Fla. Stat. Ann. sec. 608.03(1)(a) (1956), repealed by Fla. Laws 1975, c. 75-250, sec. 139 (effective Jan. 1, 1976). The Weissman legend notes only the existence of an underlying document and the subjection *34 of the shares to it. The legend on the shares here in issue certainly does no less. Therefore, we find that the provisions of Fla. Stat. Ann. sec. 678.204 (1966), insofar as they are applicable, are satisfied in the instant case. Respondent further asserts that the redemption provisions of the Certificate of Incorporation of the Lota Company are invalid and unenforceable under Florida law as unreasonable restraints on alienation. These charter provisions do not expressly purport to restrict the alienability of the stock but indirectly may do so by limiting the class to which the stock may be transferred with full rights of ownership. Somewhat similar rights of redemption have been held in states other than Florida to be subject to the rule against unreasonable restraints on alienation. See e.g., Greene v. E. H. Rollins & Sons, Inc.,22 Del. Ch. 394, 2 A.2d 249 (1938); and Lewis v. H. P. Hood & Sons, Inc.,331 Mass. 670, 121 N.E. 2d 85o (1954). The Supreme Court of Florida has long recognized that the degree to which alienation of property may be restricted is limited by public policy. Thus, under Florida law, absolute restraints on alienation *35 and unfettered powers of consent to sale of real property held by third parties have been held void. Davis v. Geyer, 151 Fla. 362, 9 So. 2d 727 (1942). A limited restraint on alienation of such property may be valid and enforceable, however, if it is "reasonable given the context in which it was promulgated." Seagate Condominium Association, Inc. v. Duffy, 330 So. 2d 484, 486 (Fla. App. 1976). The Supreme Court of Florida has recognized this doctrine in the case of restrictions on alienability of corporate stock. Weissman v. Lincoln Corp.,76 So. 2d 478 (Fla. 1954). There it noted that the Florida incorporation statutes and the particular articles of incorporation involved were ample to authorize the imposition by agreement of the stockholders of any reasonable restraints upon the transfer or alienation of shares. [76 So. 2d at 481] And it further found that an option clause of the nature here involved is, by the great weight of authority, regarded as a reasonable restraint on alienation which is valid and binding against participating stockholders and transferees with notice * * * [76 So. 2d at 482] *36 See also Coleman v. Coleman, 191 So. 2d 460, 470 (Fla. App. 1966). [4] The Weissman opinion does not elaborate upon the standards to be used to determine the reasonableness of any restraint on alienation of stock, but found that the particular restraint before it was valid and enforceable. Neither party has cited a Florida case to us involving provisions with respect to redemption of stock of a corporation comparable to those in the charter of Lota Company, nor have we found such a case. Under these circumstances, if we considered a determination of the validity of the redemption provisions contained in the charter of the Lota Company to be necessary to the resolution of the issue herein we would proceed to make this determination based on our conclusion as to the Florida law. However, in our view it is unnecessary to determine *37 the validity and enforceability under Florida law of these redemption provisions. The issue here is the value of the Class A and Class B stock of Lota Company. Unquestionably since there is no direct law of Florida available to determine the validity and enforceability of the redemption provisions, any prospective buyer of the stock would consider in determining the amount he was willing to pay for the stock the fact that these redemption provisions were present in the charter of Lota Company. Therefore, as more fully discussed hereinafter, consideration must be given to these provisions in valuing the stock whether or not they are valid and enforceable. On the other hand, as more fully discussed hereinafter, we do not agree with petitioner that the redemption provisions contained in the charter of Lota Company, even if we assume those provisions to be valid and enforceable, are binding for purposes of estate tax valuation of the stock. Section 2031 provides: SEC. 2031. DEFINITION OF GROSS ESTATE. (a) General.--The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all *38 property, real or personal, tangible or intangible, wherever situated. (b) Valuation of Unlisted Stock and Securities.--In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange. Since the Lota Company stock is not listed on any exchange, subsection 2031(b) directs us to examine all factors, including the value of listed stock of "corporations engaged in the same or a similar line of business." Section 20.2031-1(b) of the Estate Tax Regs. provides a general definition of "value." It states in part: (b) Valuation of property in general. The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death, except that if the executor elects *39 the alternate valuation method under section 2032, it is the fair market value thereof at the date, and with the adjustments, prescribed in that section. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. * * * All relevant facts and elements of value as of the applicable valuation date shall be considered in every case. * * * Section 20.23031-2 of the regulations specifically deals with the valuation of corporate stock. Where there are actual sale prices or bona fide bid and asked prices, these are stated to be influential in valuation to some degree. However, where such prices are not available, the regulation provides in part that the fair market value is to be determined by taking the following factors into consideration: * * *
(2) In the case of shares of stock, the company's net worth, prospective earning power and dividend-paying capacity, *40 and other relevant factors. Some of the "other relevant factors" referred to in subparagraphs (1) and (2) of this paragraph are: The good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * * [Sec. 20.2031-2(f), Est. Tax Regs.] Petitioner has argued that the redemption provisions, being valid and enforceable under state law, unalterably fix the value of the Lota Company Class A stock. It contends that decedent was "locked in" to the price provided in the charter and attempts to bring this case within a line of cases finding certain agreements and options conclusive in determining value. See, e.g., Wilson v. Bowers, 57 F.2d 682 (2d Cir. 1932); Estate of Orville B. Littick, 31 T.C. 181 (1958); *41 Estate of Albert L. Salt, 17 T.C. 92 (1951). We do not accept petitioner's contention. In dealing with petitioner's contention we must distinguish between the two distinct redemption rights granted in the charter. One is a right exercisable by the Class B stockholders to redeem specific shares of Class A stock on the occurrence of a specified event, the transfer of that Class A stock to "third parties." The other is a general right to retire any Class A stock at any time exercisable by a vote of the board of directors. The latter right, to retire Class A stock at any time, was a general grant of power. The charter does not specify particular circumstances in which it may be exercised, nor does it otherwise divorce such action from the ordinary discretionary activities taken on behalf of the corporation by the directors. Thus, the directors would be subject to the normal fiduciary duties owed by a director to all shareholders in exercising such a power. See Rowland v. Times Pub. Co.,160 Fla. 465, 35 So. 2d 399 (1948). The Court in Rowland explained these duties in discussing their application by another court: [The directors] are bound *42 to act in the best of faith for all stockholders. To dispose of or manage property of the corporation to the end of or for the purpose of giving one part of the cestuis que trustent a benefit or advantage over, or at the expense of, another part, is a breach of duty, especially when the directors belong to the benefited class. [35 So. 2d at 402] See also Biltmore Motor Corp. v. Roque, 291 So. 2d 114 (Fla. App. 1974). Other jurisdictions have disapproved of redemption of all of one class of stock, disproportionate redemption of stock or issuance of stock where that action was taken solely for the purpose of maintaining or shifting control of the corporation or obtaining other personal benefit for the directors or majority shareholder. Zahn v. Transamerica Corp.,162 F.2d 36, 46 (3d Cir. 1947); Anderson v. Albert & J. M. Anderson Mfg. Co.,325 Mass. 343, 90 N.E. 2d 541 (1950); Condec Corp. v. Lunkenheimer Co.,230 A.2d 769 (Del. Ch. 1967). But see Hendricks v. Mill Engr. & Supply Co.,68 Wash. 2d 490, 413 P.2d 811 (1966) (unilateral redemption upheld where directors acted in good *43 faith and with "honest business judgment"in eliminating a perceived threat to the future of the corporation). The Third Circuit dealt with a comparable issue to that of the instant case in Zahn v. Transamerica Corp.,supra, where the charter provision expressly authorized redemption of "the whole or any part of the Class A common stock of the corporation at the option of the Board of Directors." The redemption price was less than the fair market value of the stock in that case. The directors exercised the right granted by the charter at the behest of the controlling stockholder which benefited by the elimination of that class from entitlement to liquidation proceeds. Interpreting Kentucky law, the Third Circuit found this action to be unfairly detrimental to the holders whose stock was redeemed and a breach of the directors' fiduciary duties owed them. In light of the foregoing cases, we conclude that decedent stood in no danger of detrimental exercise of the general redemption provision. Without a compelling business purpose, the directors could not redeem all of the Class A stock nor a disproportionate amount of the decedent's Class A stock. These acts *44 would result in a monetary benefit to themselves as stockholders and a detriment to decedent. [5] A proportionate redemption of only part of the Class A stock, on the other hand, would not have adversely affected decedent. Since we can conceive of no significant business purpose for a complete or disproportionate redemption of the Class A stock, we find that the general redemption provision found in the corporate charter in no way affected the value of the decedent's stock. Without decedent's consent, this retirement right could not affect the amount of income to be earned or any other significant right attaching to the Class A shares. Even were these fiduciary duties not owed minority stockholders, however, *45 we would be compelled to find that this general retirement right was not truly binding on decedent because of her close, albeit indirect, control over the trustees of the Harry L. Mundy Trust No. 1, who held the voting rights to the majority of the Class A stock and who consequently controlled the board of directors.Decedent through her limited power of appointment controlled the beneficial enjoyment of the Harry L. Mundy Trust No. 2, which was the residuary of the Trust No. 1 assets and therefore the control and benefit of the corporation after decedent's death. Thus, decedent could adversely affect two of the three trustees, her son and daughter, by changing the enjoyment of the Lota Company to benefit her descendants other than the son and daughter. While this class of beneficiaries effectively included only the decedent's older son and the lineal descendants of the younger son and daughter, denial of economic benefits to this extent, coupled with the natural familial ties existing among the trustees and directors, is quite sufficient to negate any argument that decedent was in danger of losing her Class A stock through retirement by the board of directors. The other redemption *46 right granted by the charter was that exercisable by the Class B stockholders on transfer of Class A stock to "third parties." Petitioner argues that this right fixes the price decedent could have obtained for the Class A stock and thus its value, since no purchaser would pay a greater amount than the redemption price for the stock. It may be true that no third party would pay much in excess of the redemption price for the stock in light of the near certainty of prompt redemption at that price. It may also be true that any fiduciary duties owed by Class B stockholders to others would not prevent their exercise of this right in light of the express grant of power and the specification of the circumstances in which it may be exercised. Be that as it may, however, certainly no willing seller would sell his stock at the redemption price, a price not much in excess of the amount likely to be received in dividends in only one year. Fair market value requires a price at which both a willing buyer would purchase and a willing seller would sell; it is not established by satisfaction of half this equation. See section 20.2031-1(b), Estate Tax Regs. Petitioner has cited several cases *47 holding various agreements and provisions respecting sale or redemption of stock or partnership interests to be binding for purposes of estate tax valuation. E.g., May v. McGowan, 194 F.2d 396 (2d Cir. 1952); Estate of Lionel Weil, 22 T.C. 1267 (1954); Estate of Albert L. Salt, supra. These cases have a common characteristic which distinguishes them from the present case. In each of these cases there existed either a mutually binding contract to purchase or an option held by the buyer to call the stock or partnership interest for purchase. [6] The charter provision in the present case does not have this characteristic, and, where this factor is absent, this Court has distinguished the cited line of cases and held that the agreement does not fix the estate tax value.[7]
*48 In Estate of Pearl Gibbons Reynolds,55 T.C. 172 (1970), we held that a mere right of first refusal held by other parties to an agreement was insufficient to fix the value of certain voting trust certificates. Our reasoning was stated in part (at 189-90): In the instant case the certificates could be freely gifted or devised although in the hands of the donee or devisee they would remain subject to the preemption provisions. Furthermore, petitioners themselves have shown that neither Pearl nor Angeline intended to sell the certificates. Similarly, no independent event could trigger the preemption provisions.Only if one of the certificate holders desired to sell his beneficial interest in the company would the preemption provisions become operative. Finally, although petitioners intimated that in the event that Pearl or Angeline attempted to sell any of their certificates the other certificate holders and the company would quickly exercise their first-offer options, that intimation is not adequately supported by the record. In Reynolds, we recognized that the formula price there did not "represent the value of all of the rights inherent in the ownership *49 of a certificate," particularly the right to retain the security for its "investment virtues." Id. at 190. See also Krauss v. United States,140 F.2d 510 (5th Cir. 1944). This rationale applies with full force to the facts of the instant case. Petitioner argues that the rationale of Reynolds has been undercut by United States v. Cartwright,411 U.S. 546 (1973). Cartwright dealt with valuation of mutual fund shares subject to a "sales load," or sales charge, on purchase from the issuer. In essence, the issuer sold the shares at the market value of the underlying stock plus the sales load and agreed to redeem at the market value of the underlying stock without the sales load. The Supreme Court ruled unreasonable respondent's regulation [8] that required valuation for estate tax purposes at the higher price, the price including the sales load. The Court noted that that price is never paid by the fund; it is used by the fund when selling its shares to the public--and even then the fund receives merely the net asset value per share from the sale, with the sales load being paid directly to the underwriter. In short, the only price *50 that a shareholder may realize and that the fund--the only buyer--will pay is the redemption price. In the teeth of this fact, Regulation § 20.2031-8(b) purports to assign a value to mutual fund shares that the estate could not hope to obtain and that the fund could not offer. It also rejected on the particular facts before it the approach urged by the Government that there were other rights such as retention that could contribute the additional element of value. *51 This treatment by the Supreme Court has no bearing in the instant case. In Cartwright,supra, there were actual sales between willing buyers and willing sellers, but at two distinct and determinable prices. 411 U.S. at 549. The Court emphasized the ease with which these prices could be obtained. Id. at 555-56. It was this factor that negated consideration of retention rights in that case. Presumptively, all rights attaching to the securities already were reflected in the prices at which they sold between knowledgeable, willing buyers and sellers. The issue in that case was only which of the two prices more accurately reflected fair market value. In the instant case no comparable measures of value exist. Furthermore, the redemption price here was not the most decedent could have obtained, as was the case in Cartwright,supra, since stock could be sold to insiders without restriction.
Even though the redemption provisions do not fix the value of the stock, we find that the more restricted redemption right granted the Class B stockholders does have some effect on it. Respondent has asserted that section 20.2031-2(h) *52 of the Estate Tax Regulations [9] operates to deny even this application, however. He argues that the provision should be disregarded as a "device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration" and that it had no business purpose.We disagree and find that the provisions were not such a device and that they had a business purpose. On the basis of the record in this case, including the oral testimony and documentary evidence, we conclude that the redemption provisions were placed in the charter of Lota Company primarily for the purpose of keeping control of the corporation in the Mundy family or trustees of the Mundy trusts and protection of the assets of the corporation for the financial security of the Mundy family. Numerous cases have found preservation of control in a close group and continuity of corporate policies to be valid business purposes for restricting transferability of stock. E.g., Estate of Pearl Gibbons Reynolds,supra;Estate of Orville L. Littick,supra;Baltimore National Bank v. United States,136 F. Supp. 642 (D. Md. 1955). Furthermore, *53 in other contexts insulation of assets from possible liabilities has been held a valid business purpose. Green Light Co. v. United States,405 F.2d 1068 (5th Cir. 1968); Sam Siegel,45 T.C. 566 (1966). Since we conclude these were in fact the predominant reasons for the redemption provisions in the charters of the Lundi and Lota Companies, we will not disregard those provisions in our valuation of the Lota Company stock. *54 Both parties produced expert witnesses who testified to the value of the Class A and B stock of the Lota Company. Petitioner's witness, Mr. Knight, first valued the Class A shares, employing as a premise that no willing buyer would pay more than $500 per share plus the amount of any dividends likely to be accrued before exercise of the redemption rights by the corporation. Based on his opinion that 6 months might elapse before exercise, he estimated that the amount of these earnings in the future would be $524.63 per share and that the fair market value of the Class A stock was thus $1,024.63 per share.Mr. Knight then valued the Class B stock by subtracting from the fair market value of the underlying corporate assets (1) the estimated capital gain tax on unrealized appreciation, (2) the value he had reached for the bulk of the Class A stock, and (3) a 10 percent reduction for cost of liquidating the corporation.He thereby arrived at a fair market value of $4,386.03 per share for the Class B stock. While Mr. Knight believed he was employing the willing buyer/willing seller standard of fair market value in his analysis, it is clear that this was not the case. Mr. Knight admitted *55 that a Class A stockholder probably would not willingly sell his stock at the price he expressed as fair market value, and he expressed doubt that a willing buyer would pay $4,386.03 for the Class B stock, the price he stated was its fair market value. In light of these admissions and our foregoing discussion regarding the effect on value of the redemption provisions, we can accord little weight to Mr. Knight's opinion of fair market value. Respondent's witness, Mr. Goulston, approached the problem quite differently. He initially decided that the rights and benefits accruing to Class B stock were so insignificant and remote that its value was only a nominal $1 per share. Then to value the Class A stock, he determined that the Lota Company was sufficiently similar to closed-end investment companies to warrant comparison. He obtained figures matching net asset values of such corporations with the fair market value of their stock, as determined by stock exchange listings. Finding that these stocks generally sold at a discount from net asset value, he applied a discount of 10 percent to the net asset value of Lota Company, stipulated to be $4,405,988.55, and considered this to be *56 the fair market value of the Lota Company stock had its stock been free of restrictions and other peculiar considerations.He then made a further 20 percent discount to allow for the depressing or inflating effects of other factors. [10] Thus, Mr. Goulston's opinion of fair market value of the Lota Company Class A stock was $18,000 per share. While we have no quarrel with the basic approach of respondent's witness, we do note at least one significant flaw in his analysis. Mr. Goulston made no allowance in his analysis to account for any lack of comparability between the Lota Company and the corporations to which it was compared. In this regard we recognize that certain tax benefits accrue to these latter corporations and their stockholders which were not available to Lota Company and its stockholders. See sections 851-55. We have carefully considered the facts presented in the record before us, particularly the testimony of respondent's expert witness. While we consider *57 that the witness' opinion of fair market value for the Class A shares of the Lota Company is somewhat too high in light of all the evidence presented, we have found his analysis and testimony quite helpful. We find, after due consideration of all the facts of record, that for purposes of section 2031 on March 30, 1970, the value of the Class A stock of Lota Company was $15,000 per share and the value of the Class B stock was $1 per share. Decision will be entered under Rule 155. Footnotes
1. George M. Sausen was a close and old friend of the Mundy family. He was secretary of the Lota and Lundi Companies, as well as a Class B stockholder of both. At times, he also served as a director of the Lota and Lundi Companies.Mr. Sausen served as Harry L. Mundy's personal and business secretary, taking care of much of the family business. George M. Sausen died in 1973, and in May of 1973 the Lota Company redeemed the two shares of the Lota Company Class B stock held by his estate for $1,000 per share.↩
a. Actually held by the Estate of Harry L. Mundy subject to an order of distribution to Lota C. Mundy. ↩
b. Trustees were: Palmer First National Bank & Trust Co., Harry L. Mundy, Jr., and Anne M. Lazareff. ↩
c. Trustees were: Palmer First National Bank & Trust Co., Harry L. Mundy, Jr., and Lota C. Mundy.↩
2. While the above schedule indicates only 99 shares of Class A stock were outstanding from December 21, 1962 to August 11, 1967, the effect of the order of the Sarasota Circuit Court on June 7, 1967, would require the multiplication of the amounts per share during that period by 99/200ths.↩
3. All section references herein are to the Internal Revenue Code of 1954, as amended.↩
4. The Florida District Court of Appeal in Coleman reaffirmed adherence to the doctrine recognized by the Court in Weissman↩. However, the decision in that case, holding certain transfer restrictions unenforceable, appears to be based on a waiver of the restrictions in that case rather than on their unreasonableness.
5. Disproportionate redemption would have changed decedent's share of dividend income. Complete redemption would shift all income to the Class B shares.While decedent would thus receive a larger share of current income as the sole income beneficiary of the Harry L. Mundy Trust No. 2, the change in the nature of her interest in Lota Company from shareholder to income beneficiary would be likely to support an injunction of the redemption if attempted without her consent.↩
6. Insofar as the Second Circuit case of Wilson v. Bowers, 57 F.2d 682 (2d Cir. 1932), indicates that a mere right of first refusal without the described characteristic of callability may be binding for purposes of estate tax valuation, we have rejected that view. Estate of Pearl Gibbons Reynolds, 55 T.C. 172, 189-90 (1970). See also Commissioner v. McCann, 146 F.2d 385↩ (2d Cir. 1944). 7. The first redemption right discussed would arguably possess this characteristic. However, as noted in our discussion on that provision, the exercise of that right could have no effect on value of the Lota Company stock, regardless of the cited line of cases.↩
8. Sec. 20.2031-8(b), Estate Tax Regs., as then in effect, provided: (b) Valuation of shares in an open-end investment company. (1) The fair market value of a share in an open-end investment company (commonly known as a "mutual fund") is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In the absence of an affirmative showing of the public offering price in effect at the time of death, the last public offering price quoted by the company for the date of death shall be presumed to be the applicable public offering price. If the alternate valuation under section 2032 is elected, the last public offering price quoted by the company for the alternate valuation date shall be the applicable public offering price. If there is no public offering price quoted by the company for the applicable valuation date (e.g., the valuation date is a Saturday, Sunday, or holiday), the fair market value of the mutual fund share is the last public offering price quoted by the company for the first day preceding the applicable valuation date for which there is a quotation, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In any case where a dividend is declared on a share in an open-end investment company before the decedent's death but payable to shareholders of record on a date after his death and the share is selling "ex-dividend" on the date of the decedent's death, the amount of the dividend is added to the ex-dividend quotation in determining the fair market value of the share as of the date of the decedent's death. As used in this paragraph, the term "open-end investment company" includes only a company which on the applicable valuation date was engaged in offering its shares to the public in the capacity of an open-end investment company. (2) The provisions of this paragraph shall apply with respect to estates of decedents dying after October 10, 1963.↩
9. This regulation states: Securities subject to an option or contract to purchase↩. Another person may hold an option or a contract to purchase securities owned by a decedent at the time of his death. The effect, if any, that is given to the option or contract price in determining the value of the securities for estate tax purposes depends upon the circumstances of the particular case. Little weight will be accorded a price contained in an option or contract under which the decedent is free to dispose of the underlying securities at any price he chooses during his lifetime. Such is the effect, for example, of an agreement on the part of a shareholder to purchase whatever shares of stock the decedent may own at the time of his death. Even if the decedent is not free to dispose of the underlying securities at other than the option or contract price, such price will be disregarded in determining the value of the securities unless it is determined under the circumstances of the particular case that the agreement represents a bona fide business arrangement and not a device to pass the decedent's shares to the natural objects of his bounty for less than an adequate and full consideration in money or money's worth.
10. He considered the closely held nature of the corporation, the uncertainty regarding the redemption provisions, the provision for mandatory dividend payment, and the dividend history of the company.↩