# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3774

_____

|  |  |  |
|---|---|---|
| Thomas H. Holman, Jr.; Kim D.L. Holman, Donors, | * * * | |
| Appellants, | * * | |
| v. | * * | Appeal from the United States Tax Court. |
| Commissioner of Internal Revenue, | * * * | |
| Appellee. | * | |

_____

Submitted: September 22, 2009
Filed: April 7, 2010 (Corrected: 04/07/2010)

_____

Before MELLOY, BEAM, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

Thomas H. Holman, Jr. and Kim D.L. Holman (the "donors") created a limited partnership, funded it with common stock of Dell, Inc., and gifted limited partnership shares to their children. In a gift-tax return, the donors asserted lack-of-marketability and minority-interest discounts to claim a value for the gifts substantially below the value of the underlying Dell stock. In doing so, the donors relied in part on transfer restrictions contained in the partnership agreement, asserting that the transfer restrictions would depress the value of the partnership shares relative to the value of the underlying assets.

The Commissioner challenged the return, characterizing the gifts as gifts of Dell stock rather than gifts of limited partnership shares. In addition, the Commissioner applied Internal Revenue Code § 2703 and disregarded the partnership agreement's transfer restrictions for valuation purposes. Finally, the Commissioner agreed that lack-of-marketability and minority-interest discounts should apply but asserted that the discounts should be smaller than claimed by the donors.

The Tax Court[1] held that the gifts were gifts of limited partnership shares. The Tax Court also held that the Commissioner correctly applied I.R.C. § 2703 and properly disregarded the partnership agreement's transfer restrictions. Finally, the Tax Court applied smaller lack-of-marketability and minority-interest discounts than claimed by the donors.

In doing so, the Tax Court adopted the lack-of-marketability discount as asserted by the Commissioner's expert based on historical studies of restricted stock sales. The Tax Court noted that the partnership held only highly liquid, easily valued assets and that the agreement contained a consensual dissolution provision and granted broad management discretion to the general partners. According to the Tax Court, because economically rational actors would take advantage of the dissolution provision to dissolve and reconstitute the partnership or otherwise buy out a departing partner, there was a natural cap on any lack-of-marketability discount.

On appeal to our court, the Commissioner does not challenge the determination that the gifts were gifts of partnership shares. The donors challenge the Tax Court's application of I.R.C. § 2703, its determination of marketability and minority-interest discounts, and its overall valuation determination. We affirm the judgment of the Tax Court.

---

[1]The Honorable James S. Halpern, United States Tax Court.

I. Background

The donors amassed wealth primarily in the form of Dell stock during Thomas's tenure as a Dell employee. They sought to transfer wealth to their children, preserve wealth within their family, and prevent their children from dissipating assets. At the same time, they sought to teach their children basic investing principles and impart to their children a general understanding of responsibility attendant to wealth. As part of an overall estate-planning process seeking to achieve these goals, Thomas and Kim met with counsel and developed an estate and gifting plan that involved execution of wills, creation of the limited partnership, transfer of Dell stock into the limited partnership, and transfer of limited partnership shares to a trustee and conservator for the children. The children, who already owned some Dell stock through the trustee and conservator or in accounts under different states' versions of the Uniform Transfers to Minors Act, transferred their Dell stock into the partnership in exchange for additional partnership shares.

Several provisions of the partnership agreement are material to the issues in this appeal. Section 3.1 lists the purposes of the partnership:

3.1 Purposes. The purposes of the Partnership are to make a profit, increase wealth, and provide a means for the Family to gain knowledge of, manage, and preserve Family Assets. The Partnership is intended to accomplish the following:

(1) maintain control of Family Assets;
(2) consolidate fractional interests in Family Assets and realize the efficiencies of coordinated investment management;
(3) increase Family wealth;
(4) establish a method by which gifts can be made without fractionalizing Family Assets;
(5) continue the ownership of Family Assets and restrict the right of non-Family persons to acquire interests in Family Assets;

-3-

(6) provide protection to Family Assets from claims of future creditors against Family members;
(7) provide flexibility in business planning not available through trusts, corporations, or other business entities;
(8) facilitate the administration and reduce the cost associated with the disability or probate of the estates of Family members; and
(9) promote the Family's knowledge of and communication about Family Assets.

Section 6.1 grants the general partners "exclusive management and control of the business of the Partnership" including "the power and authority . . . to determine the investments and investment strategy of the Partnership." Sections 8.4 and 9.1 provide that limited partners may not withdraw from the partnership or involuntarily or voluntarily assign or encumber their limited partnership interests except as permitted by the agreement. Section 9.2 describes various permitted assignments such as assignments to family members or assignments to trusts or to certain custodians where such trusts or custodians hold the partnership interests exclusively for the benefit of family members. Section 9.3, which we address in more detail below, describes conditions under which the partnership may acquire partnership interests that are lawfully assigned in a manner prohibited by the agreement. Finally, section 12.1 provides that the partnership may be dissolved by the written consent of all partners.

Section 9.3 provides that the partnership has an option to purchase at an appraised value any partnership interest assigned in a manner that is prohibited by the agreement but that is otherwise lawful. Specifically, section 9.3 provides that the partnership may purchase such an interest over a five-year period at a determined interest rate with a ten-percent down payment. Further, the partnership may assign the right to acquire such an interest to one or more current partners. Finally, the partners may consent to let the prohibited assignee become a limited partner. If the partners refuse such consent and elect not to exercise the right to acquire the assigned shares, the otherwise impermissible holder of the assigned shares does not gain the

rights of a limited partner. Rather, such a holder gains merely the limited right to receive distributions to which the assignor–partner would have been entitled.

The gifts of partnership shares occurred in 1999, 2000, and 2001. In gift tax returns for these years, the donors claimed overall discounts of slightly over 49% relative to then-prevailing market prices for the underlying Dell stock. These discounts were based on appraisal recommendations that considered minority status and lack of marketability. These discounts also took into consideration the perceived impact of sections 8.4 and 9.1–9.3 upon the value of limited-partnership shares. In notices of deficiency, the Commissioner initially asserted that it would be proper to allow an overall discount of 28% for minority status and lack of marketability. The Commissioner based this lower discount on the view that the partnership units "should be valued without regard to any restriction on the right to sell or use the partnership interest within the meaning of [I.R.C. § 2703(a)(2)]."

Ultimately, when the case progressed before the Tax Court, the Commissioner employed an appraiser and argued that an even smaller discount should apply. The donors also employed an appraiser, and the appraisers' methods were detailed and require some discussion. We describe their methods and their detailed opinions below in the section of our analysis addressing the valuation.

In testimony before the Tax Court, the donors described their purposes for creating and funding the partnership, gifting shares to their children, and including transfer restrictions in the partnership agreement. Neither donor claimed an intent to maintain Dell stock as the sole asset of the partnership nor described any particular investment strategy they intended to employ, other than a future intent to diversify the portfolio's holdings. Neither donor claimed an intent to hold anything other than passive investments in the partnership nor described any business activity related to the partnership. Between formation of the partnership and the submission of the case, the partnership held only Dell stock. The total amount of stock the partnership held

represented approximately 0.28 % of the outstanding stock of Dell, and the parties agree that the broader market could easily absorb this amount.

Mr. Holman testified as to the goal of asset preservation, and the Tax Court interpreted this to mean protection of assets from dissipation by the children. Mr. Holman explained his understanding of sections 9.1–9.3 and how these sections would preclude the children from assigning or giving away their interests. Mrs. Holman testified that the purpose of the partnership was "to be able to teach . . . [the] children about wealth and the responsibility of that wealth."

In light of the purposes stated in section 3.1 of the Agreement, and in light of the donors' testimony, the Tax Court concluded:

> We believe that paragraphs 9.1 through 9.3 were designed principally to discourage dissipation by the children of the wealth that Tom and Kim had transferred to them by way of the gifts. The meaning of the term "bona fide business arrangement" in section 2703(b)(1) is not self apparent. As discussed supra, in Estate of Amlie v. Commissioner, [91 T.C.M. (CCH) 1017], we interpreted the term "bona fide business arrangement" to encompass value-fixing arrangements made by a conservator seeking to exercise prudent management of his ward's minority stock investment in a bank consistent with his fiduciary obligations to the ward and to provide for the expected liquidity needs of her estate. Those are not the purposes of paragraphs 9.1 through 9.3. There was no closely held business here to protect, nor are the reasons set forth in the Committee on Finance report as justifying buy-sell agreements consistent with petitioners' goals of educating their children as to wealth management and "disincentivizing" them from getting rid of Dell shares, spending the wealth represented by the Dell shares, or feeling entitled to the Dell shares.

-6-

We find that paragraphs 9.1 through 9.3 do not serve bona fide business purposes. Those paragraphs do not constitute a bona fide business arrangement within the meaning of section 2703(b)(1).

Holman v. C.I.R., 130 T.C. 170, 195 (2008).

The Tax Court also concluded that the restrictions were merely a testamentary device such that the donors failed to satisfy § 2703(b)(2). The Tax Court did not reach the arms-length transaction test of § 2703(b)(3). Having determined that the transfer restrictions of sections 9.1–9.3 were to be disregarded for valuation purposes, the Tax Court assessed the remaining aspects of the competing experts' valuation opinions. The Tax Court accepted lack-of-marketability discounts of 12.5% for each tax year and minority-interest discounts of 4.63–14.34%, all as asserted by the Commissioner's expert. The donors appeal.

II. Discussion

    a.    I.R.C. § 2703

Restrictions on the sale or use of property generally tend to depress the value of the property. Oftentimes, such restrictions serve legitimate business purposes, impose actual and meaningful limitations on the use or transferability of property, and are accepted by parties dealing with one another in arms-length transactions. When carefully crafted and applied in certain circumstances, however, such restrictions can minimize the tax consequences of gifts or transfers without imposing substantial additional limitations on the transferability or use of the property. This is particularly true in the context of family transfers where a donor may hold some degree of practical control over a recipient's actions, even in the absence of formal restrictions, and where transactions often do not occur at arms length. In this context and in others, Congress has expressed concern over the abusive use of such restrictions. See, e.g., Explanatory Material Concerning Committee on Finance 1990 Reconcilia-tion

-7-

Submission Pursuant to House Concurrent Resolution 310, 136 Cong. Rec. S15629-04, S15681 (1990) ("Finance Committee Report") ("[T]he committee is aware of the potential of buy-sell agreements for distorting transfer tax value. Therefore, the committee establishes rules that attempt to distinguish between agreements designed to avoid estate taxes and those with legitimate business agreements. These rules generally disregard a buy-sell agreement that would not have been entered into by unrelated parties acting at arm's length.").

In attempting to sort between permissible and impermissible uses of such restrictions, Congress repealed an earlier Code provision, I.R.C. § 2036(c) (1987) because "the committee [was] concerned that the statute's complexity, breadth, and vagueness posed an unreasonable impediment to the transfer of family businesses." Finance Committee Report, 136 Cong. Rec. S15680. In 1990, Congress enacted in its place a statute that broadly prohibits consideration of restrictions for valuation purposes, see I.R.C. § 2703(a), but allows taxpayers to prove eligibility for an exception that permits valuation based on such restrictions, see I.R.C. § 2703(b).

To be eligible for the exception and gain the benefit of having such restrictions considered for valuation purposes, the taxpayer must satisfy a three-part test: the restriction must be "a bona fide business arrangement," it must not be "a device to transfer such property to members of the decedent's family for less than full and adequate consideration," and its terms must be "comparable to similar arrangements entered into by persons in an arms' length transaction."[2] Because we conclude that

_____

[2]Section 2703 provides:

(a)    General rule.–For purposes of this subtitle, the value of any property shall be determined without regard to–

(1)    any option, agreement, or other right to acquire or use the property at a price less than the fair market value of the

the Tax Court correctly held the present restrictions are not "a bona fide business arrangement" in accordance with § 2703(b)(1), we address only that first part of the test.

The ultimate question of whether there was a bona fide business arrangement is a question of fact to be reviewed for clear error. See Estate of True v. Comm'r, 390 F.3d 1210, 1218–19 (10th Cir. 2004) (holding that the question of whether an "agreement was entered into for bona fide business reasons and is not a testamentary substitute" is a question of fact reviewed for clear error); cf. St. Louis County Bank v. United States, 674 F.2d 1207, 1210–11 (8th Cir. 1982) (affirming a finding that stock-purchase agreement "had a bona fide business purpose" but finding an outstanding question of fact as to whether it was merely a testamentary transfer).

As noted, the Tax Court in the present case viewed the restrictions as failing the "bona fide business arrangement" test. The Tax Court emphasized Mr. Holman's testimony in which he failed to identify any current or planned activity by the partnership other than holding passive investments without a clearly articulated

property (without regard to such option, agreement, or right), or
(2)     any restriction on the right to sell or use such property.

(b)     Exceptions.–Subsection (a) shall not apply to any option, agreement, right, or restriction which meets each of the following requirements:

(1)     It is a bona fide business arrangement.
(2)     It is not a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth.
(3)     Its terms are comparable to similar arrangements entered into by persons in an arms' length transaction.

-9-

investment strategy. In addition, he made clear that asset preservation meant preservation from dissipation by the children, not the pursuit of any particular investment strategy. Mrs. Holman emphasized the personal goals of educating the children as to financial responsibility.

In support of the opposite conclusion, the donors cite several Tax Court cases addressing the business-purpose element of § 2703(b)(1) or similar clauses in other provisions of the Tax Code. The donors argue the Tax Court in the present case applied an overly restrictive definition for the phrase "business arrangement" and effectively imposed an "operating business nexus" or requirement that the underlying partnership be an actively managed enterprise. The donors also argue that the "business arrangement" test should be applied looking solely at the taxpayer's stated intentions and at the language of the restrictions in the partnership agreement without considering the actual context of this case and the nature of the underlying assets. The donors sum up their position in their brief, asserting that "the nature of the assets of the Partnership is irrelevant for purposes of determining whether the restrictions in paragraphs 9.1 and 9.3 constitute a bona fide business arrangement. There is no dispute that the Partnership was an enterprise with the business purpose of generating profits through long-term growth."

We agree with the Tax Court's conclusion and reject the donor's attempt to characterize the Tax Court's opinion as creating an "operating business nexus." In answering the question of whether a restriction constitutes a bona fide business arrangement, context matters. Here that context shows that the Tax Court correctly assessed the personal and testamentary nature of the transfer restrictions. Simply put, in the present case, there was and is no "business," active or otherwise. The donors have not presented any argument or asserted any facts to distinguish their situation from the use of a similar partnership structure to hold a passbook savings account, an interest-bearing checking account, government bonds, or cash. We and other courts have held that "maintenance of family ownership and control of [a] business" may be

a bona fide business purpose.  St. Louis County Bank, 674 F.2d at 1207; see also Estate of Bischoff v. Comm'r, 69 T.C. 32, 39–40 (1977).  We have not so held, however, in the absence of a business.[3]

That is not to say we necessarily believe it will always be easy to apply § 2703(b)(1) or that investment-related activities cannot satisfy the subsection (b)(1) test.  When the restrictions at issue, however, apply to a partnership that holds only an insignificant fraction of stock in a highly liquid and easily valued company with no stated intention to retain that stock or invest according to any particular strategy, we do not view this determination as difficult.  See, e.g., Higgins v. Comm'r, 312 U.S. 212, 217–18 (1941) (holding in another context that merely keeping records and collecting interest and dividends did not amount to "carrying on a business"); Estate of Thompson v. Comm'r, 382 F.3d 367, 380 (3d Cir. 2004) ("Other than favorable estate tax treatment resulting from the change in form, it is difficult to see what benefit could be derived from holding an untraded portfolio of securities in this family limited partnership with no ongoing business operations.").

One case the donors cite in support of their position is Estate of Amlie v. Comm'r, 91 T.C.M. (CCH) 1017 (2006).  There, the Tax Court found that a buy–sell

---

[3] In St. Louis County Bank, for example, the transferred interests were shares in a family company that had started out as a moving, storage, and parcel-delivery business and evolved into a real estate management company.  St. Louis Bank, 674 F.2d at 1208–09.  When engaged in the moving and storage business, the company had created a stock-purchase agreement based on a valuation formula keyed to income.  Id. at 1209.  Later, the family exited the moving and storage business but kept the business structure as a vehicle for renting real estate.  Id.  With this new activity, the formula resulted in a dramatically lower value.  Id.  We stated, "We have no problem with the District Court's findings that the stock-purchase agreement provided for a reasonable price at the time of its adoption, and that the agreement had a bona fide business purpose—the maintenance of family ownership and control of the business.  Courts have recognized the validity of such a purpose."  Id. at 1210.

agreement was a bona-fide business arrangement where a fiduciary had entered into the agreement to ensure the ability to sell stock that represented an otherwise illiquid minority interest in a closely held bank. Id. at *12. The Tax Court viewed this purpose as patently business oriented and likely necessary to ensure that the fiduciary could fulfill his duty of protecting the beneficiary by ensuring the ability to sell the underlying assets. Id.

Here, in contrast, the donors did not enhance the liquidity of an otherwise illiquid asset through their actions nor do they claim their actions were necessary as a matter of business necessity to ensure a market for the assets. The underlying Dell stock is widely held, easily valued, and highly liquid. The donors placed it into the partnership thereby burdening it with illiquidity as part of an overall estate and gift planning process. As such the donor's reliance on Amlie is misplaced.

In Estate of Bischoff v. Comm'r, 69 T.C. 32 (1977), the question was whether the price contained in a buy–sell agreement regarding limited-partnership shares was controlling for valuation purposes. In that case, the Tax Court stated, "the cases have held that the maintenance of family ownership and control constituted a legitimate business consideration." Id. at 39–40. The underlying asset in Bischoff was "a pork processing business organized, controlled, and managed by three families" who sought "to assure their continuing ability to carry on their pork processing business without outside interference, including that of a dissident limited partner." Id. at 40. In Bischoff then, there was a perceived risk of an outsider interfering with management.

There is no similarity between the facts of Bischoff and the present case because limited partners in the Holman partnership held little-to-no ability to interfere with asset management. Further, the donors have made no allegation that they, as the general partners, are skilled or savvy investment managers whose expertise is needed or whose investment philosophy needs to be conserved or protected from interference

-12-

as might justify placement of stock assets into the partnership. Finally, the assets of the partnership—passively held Dell stock—are not assets with which an outsider or dissident owner might interfere. In the quantities held by the partnership, the value of the underlying assets are largely unaffected by the individual actions of the general partners or other owners of relatively insignificant fractions of outstanding stock (unlike the actions of potentially dissenting co-owners of a pork-processing enterprise).

Arguably, the strongest cases for the donors are a line of cases involving investment entities with restrictions imposed to ensure perpetuation of an investment model or strategy. See Estate of Black v. Comm'r, 133 T.C. 15 (2009); Estate of Murphy v. United States, No. 07-CV-1013, 2009 WL 3366099 (W.D. Ark. Oct. 2, 2009); Estate of Schutt v. Comm'r, 89 T.C.M. (CCH) 1353 (2005). The donors cite Schutt for the proposition that relatively inactive investment trusts or shells involving restricted rights may nevertheless involve legitimate business purposes and gain favored tax treatment. In making this point, the donors again attempt to portray the present Tax Court opinion as imposing an "operating business nexus" arguably contrary to Schutt. These cases, however, are more nuanced than the donors assert, and each involves unique facts not present in our case.[4]

In Schutt, the Tax Court addressed a different code section, but one of the underlying questions at issue was similar: whether the transfer of publicly traded stock into a business trust was a bona fide sale for full and adequate consideration. Id. at *18 (discussing the "bona fide sale" exception to 26 U.S.C. § 2036(a)). Under relevant Third Circuit authority, the Tax Court viewed this requirement as having a

---

[4]These cases address a slightly different, albeit similar, question under I.R.C. § 2036(a), the presence of a "legitimate business purpose." We, nevertheless, feel compelled to comment on these cases because they do not stand for the apparently broad proposition the donors would have us adopt, namely, that holding investments for gain necessarily satisfies the "bona fide business arrangement" test.

-13-

good faith element and also a "legitimate business purpose" element.  <u>Id.</u> at *19–20 (applying <u>Estate of Thompson</u>, 382 F.3d at 383).  Regarding the legitimate business purpose, the Tax Court ultimately concluded that the maintenance and perpetuation of a specific buy-and-hold investment strategy was, in that case, a legitimate business purpose.  <u>Id.</u> at *25.  The court based its decision on an express factual finding that the transferor's primary objective was to preserve his very specific investment strategy.  <u>Id.</u>  In so holding, however, the Tax Court appeared to recognize that it was approaching an outside limit as to the meaning of legitimate business purpose and noted the "unique circumstances of this case."  <u>Id.</u>  In fact, the court noted the general position that "the mere holding of an untraded portfolio of marketable securities weighs negatively in the assessment of potential nontax benefits."  <u>Id.</u>

The facts of <u>Schutt</u> did not end up being as unique as suggested, and the Tax Court and a district court subsequently reached similar results in <u>Murphy</u> and <u>Black</u>.  In <u>Estate of Erickson v. Comm'r</u>, 93 T.C.M. (CCH) 1175 (2007), however, the Tax Court distinguished <u>Schutt</u>, effectively illustrating an important difference between cases like <u>Schutt</u> and the present case:

> We have found a significant nontax purpose where the justification for the transaction was the decedent's personal views and concerns regarding the operation of an income-producing activity and not a business exigency.  There is no significant nontax purpose, however, where a family limited partnership is just a vehicle for changing the form of the investment in the assets, a mere asset container.

<u>Id.</u> at *10 (internal citations omitted).

Here, as in <u>Erickson</u>, the family partnership is "a mere asset container."  <u>Id.</u>  The donors do not purport to hold any particular investment philosophy or possess any particular investing insight.  The present partnership agreement does not require that the general partners retain the Dell stock held by the partnership and the donors

-14-

apparently intend to diversify their investments, although they have articulated no time frame or strategy for doing so. The donors admit that holding Dell stock as the exclusive asset of the limited partnership is not part of an overall, long-term plan. Here, then, unlike <u>Schutt</u>, the family membership, educational, and tax-reduction purposes overshadow any claim of a business purpose for the restrictions.

If anything, the important rule that we believe may be taken from <u>Schutt</u> and cases like it is that context matters such that it is appropriate to defer to the reasoned judgment and fact-finding ability of the Tax Court. In this regard, we note that in <u>St. Louis County Bank</u>, our case that set forth two of the three steps that Congress subsequently adopted in § 2703(b), we clearly emphasized the importance of context in this factually intense inquiry. We emphasized that the transaction at issue had taken place in the context of a donor who was facing a present heart condition and had a history of heart conditions suggesting a predominately testamentary motive to the transactions. <u>St. Louis County Bank</u>, 674 F.2d at 1210. In the present case, looking at the entirety of the surrounding transactions—including the contemporaneous execution of wills, Mr. Holman's understanding of the potential tax benefits of his actions, Mrs. Holman's educational goals, and the absence of any business activity—we find ample support for the Tax Court's determination. When viewed in this context, there is little doubt that the restrictions included in the Holmans' limited partnership agreement were not a bona fide business arrangement, but rather, were predominately for purposes of estate planning, tax reduction, wealth transference, protection against dissipation by the children, and education for the children.[5]

---

[5]Given our resolution of the "business arrangement" issue, we need not address the additional requirements of § 2703. Our election not to address these issues, however, should not be interpreted as implicit agreement with the dissent. We note that the Tax Court elected not to decide the § 2703(b)(3) requirement regarding the comparability of terms to those found in arms-length transactions. The dissent, however recites limited agreement between the parties' experts on this issue as recognized in dicta from the Tax Court. We are compelled, therefore, to note that we do not believe the parties' experts were as aligned on this issue as suggested by the

b.      Valuation

In the Tax Court, the parties disagreed as to the value of the underlying Dell stock on the dates of the gifts as well as the appropriate marketability and minority-interest (lack-of-control) discounts.  On appeal, aside from the § 2703 issue, the donors challenge only the Tax Court's determination of a marketability discount. The determination of an appropriate discount is a question of fact that we review for clear error.  Estate of Ford v. Comm'r, 53 F.3d 924, 926–27 (8th Cir. 1995).

The donor's expert, Mr. Ingham, and the Commissioner's expert, Mr. Burns, employed methodologies there were similar in part.  They looked to studies comparing the private sales of restricted, unregistered stock in public companies with contemporaneous, unrestricted sales of registered stock in those same companies. According to the experts, although these studies were not perfect analogs for sales of partnership interests, they did serve as examples providing insight as to price discrepancies between freely transferable stock in publicly traded companies and less marketable versions of the same stock, thereby illustrating pricing discounts that could be attributed to the absence of ready market.

The Tax Court agreed with the experts that the studies were useful, and we also agree.  In general, Securities and Exchange Commission (SEC) rules limit owners' ability to sell unregistered stock in public companies other than (1) sales to institutional buyers, or (2) sales subject to certain holding periods. Rule 144, adopted

---

dissent.  For example, the Commissioner's expert opined that "when you look at the overall context . . . the issue of [transfer restrictions] wouldn't arise, because nobody at arm's length would get into this deal." He later stated, "[B]ased on my experience . . . I couldn't find anybody who would do this deal, who would let their client into a deal like this as a limited partner without writing a very large CYA memo, saying: 'We advise against this.'"  Given this disagreement and the absence of a Tax Court ruling, we believe it is prudent not to address the § 2703(b)(3) requirement on appeal.

in 1972, imposed a two-year holding period on the resale of restricted stock. 17 C.F.R. § 230.144 (1972); 37 Fed. Reg. 591 (Jan. 14, 1972). Rule 144A, adopted in 1990, permits qualified institutional buyers to buy and sell unregistered, restricted stock. 17 C.F.R. § 144A (1990); 55 Fed. Reg. 17933-01 (April 30, 1990). In 1997, the SEC amended Rule 144 to reduce the holding period from two years to one year. 17 C.F.R. § 230.144 (1997); 62 Fed. Reg. 9242-01 (Feb. 28, 1997).

The experts' opinions in the present case differed in the degree of detail with which they discussed these evolving rules and the general inferences about marketability discounts that might be drawn from sales throughout the years that these rules were in effect. Mr. Ingham studied a sample of transactions with median and mean discounts of 24.8% and 27.4%, respectively. He then concluded, without additional quantitative explanation, that qualitative differences between the restricted-stock studies and the present, limited partnership situation justified a marketability discount of 35%. Mr. Burns criticized this upward adjustment as speculative and unsupported. The Tax Court agreed with Mr. Burns and rejected Mr. Ingham's conclusion, noting that it "need not rely on the unsupported assumption of an expert witness."

Mr. Burns examined restricted-stock sales with greater detail. He looked at sales during separate windows of time corresponding to the SEC's adoption of its different regulations. Mr. Burns explained that marketability discounts as per the studies included holding-period components and liquidity components.[6] He observed that for sales of restricted stock between 1972 and 1990, when there was a two-year holding period and no institutional-buyer market, the sale price for restricted shares was, on average 34% lower than sales of corresponding unrestricted shares. He then noted that between 1990 and 1997, when a limited market was created among

___

[6]Mr. Ingham appears to have conceded that Mr. Burns was correct in this qualitative explanation for different components of overall marketability discounts.

-17-

institutional buyers, the average price difference between restricted stock and corresponding non-restricted stock was 22%. He opined that the 12% difference in these two periods of time was reflective of the fact that buyers demanded a 12% discount to account for the lack of a secondary market. He concluded that the remaining portion of the discounts observed in the studies were due to holding-period restrictions not applicable in the context of the Holman partnership shares. He concluded, therefore, that the 12% lack-of-market or liquidity discount was similar to what private buyers of the limited-partnership shares would demand.

Mr. Burns continued his analysis by explaining why he believed it was appropriate to accept a marketability discount in the range of 12% rather than adjusting this amount substantially upward. Looking at the terms of the Agreement, he found a natural limit or cap on any discounts. He discussed the fact that the Agreement permitted all shareholders, by unanimous agreement, to dissolve the partnership and that it permitted partners or the partnership to buy out an exiting partner. He also noted the ease with which the value of the underlying assets could be determined on any given day. He opined that if outside buyers were to demand too great a discount relative to the then-prevailing price of Dell stock, economically rational insiders would have a clear incentive to step into the void and purchase the exiting partner's shares at a lesser discount, thereby providing a cap or ceiling to any potential discount.

The donors on appeal do not vigorously defend their expert's opinion regarding a 35% discount based on studies of restricted-stock sales. They do not claim that their expert disagreed with Mr. Burns's characterization of marketability discounts as including holding-period and liquidity components. Nor do they discuss their expert's failure to address this distinction. They do note that their expert's opinion is commensurate in scope with the discounts Mr. Burns cited for restricted stock sales between 1972 and 1990. They do not point to anything in the record, however,

suggesting that Mr. Ingham based his overall recommendation on the prevailing discount from that era.

The donor's primary argument on appeal focuses on the later aspect of Mr. Burn's opinion discussing what insiders likely would do in the face of potentially large discounts in partnership share price relative to Dell stock prices. The donors argue that this line of reasoning violates the hypothetical willing buyer/willing seller test by asking what the partnership or particular family members in this case would do rather than asking what hypothetical buyers and sellers would do. See Treas. Reg. § 25.2512-1 ("The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts."); id. § 2512-3 ("The fair market value of any interest in a business, whether a partnership or a proprietorship, is the net amount which a willing purchaser, whether an individual or a corporation, would pay for the interest to a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts.").

When assessing hypothetical transactions between hypothetical buyers and sellers, it is improper to ascribe motivations that are personal and reflective of the idiosyncracies of particular individuals. See Estate of Jung v. Comm'r, 101 T.C. 412, 438 (1993) (refusing to cast a family corporation as the willing buyer where the attempt to do so was based on the non-economic-based view that the family corporation would purchase an interest merely to keep ownership within the family); Propstra v. United States, 680 F.2d 1248, 1251–52 (9th Cir. 1982) (refusing to cast executor and beneficiaries as hypothetical willing sellers to avoid "delicate inquiries into the feelings, attitudes, and anticipated behavior of those holding undivided interests in . . . property."). Rather, it is necessary to view such persons as economically rational actors possessing all relevant information and seeking to maximize their gains. See Estate of Jameson v. Comm'r, 267 F.3d 366, 370 (5th Cir.

2001) ("The buyer and seller are hypothetical, not actual persons, and each is a rational economic actor, that is, each seeks to maximize his advantage in the context of the market that exists at the date of valuation."); Curry's Estate v. United States, 706 F.2d 1424, 1431 (7th Cir. 1983) ("[T]he sole relevant consideration in determining whether the company here should be valued as liquidated or as a going concern is *which alternative could be expected to yield the profit-maximizing result*. . . . [T]he subjective intention or 'idea' of this particular plaintiff corporation . . . is irrelevant . . . . To hold otherwise would be to command future juries to wade into the thicket of personal corporate idiosyncrasies and non-market motives as part of their valuation quest . . . .") (emphasis added); Estate of Newhouse v. Comm'r, 94 T.C. 193, 218 (1990) ("The hypothetical willing buyer and seller are presumed to be dedicated to achieving the maximum economic advantage.").

Here, we believe the Tax Court's approach in adopting Mr. Burns's analysis comports with this general rule of casting the potential buyer merely as a rational economic actor. A buyer possessed of all relevant information would know that (1) the underlying assets are highly liquid and easily priced; (2) the amount held by the partnership could be absorbed by the broader market and represents but a small fraction of the total outstanding market capitalization of Dell corporation; (3) the partnership agreement permits the buying out of exiting partners or dissolution upon unanimous consent of all partners; and (4) there would be little or no economic risk and likely no additional capital infusion necessary for remaining partners to buy out an exiting partner.

Against this backdrop, it is not necessary to look at the personal proclivities of any particular partner or the idiosyncratic tendencies that might drive such a specific person's decisions. Rather it is only necessary to examine what is technically permissible in accordance with the agreement and forecast what rational actors would do in the face of a pending sale at a steep discount relative to net asset value. Simply put, the Tax Court did not ascribe personal non-economic strategies or motivations to

hypothetical buyers; it merely held that, presented with the opportunity, rational actors would not leave money on the table.

We affirm the judgment of the Tax Court.

BEAM, Circuit Judge, dissenting.

Because I would reverse the Tax Court's applications of I.R.C. § 2703's property valuation rules and Treasury Regulation § 25.2512-1's willing buyer/willing seller test, I respectfully dissent.

## I.    I.R.C. § 2703

I.R.C. § 2703(a)(2) provides that the value of any property shall be determined without regard to "any restriction on the right to sell or use such property."  As an exception to this general rule, § 2703(b) provides that a restriction is considered for property valuation purposes if it meets each of the following requirements:

(1)    It is a bona fide business arrangement.
(2)    It is not a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth.
(3)    Its terms are comparable to similar arrangements entered into by persons in an arms' length transaction.

The court majority halted its analysis after its discussion of § 2703(b)(1), holding that the Holman partnership restrictions were not bona fide business arrangements.  I, however, would hold that the restrictions safely satisfy § 2703(b)(1)'s bona fide business arrangement test as well as the remaining tests in § 2703(b)(2) and (3).

## A.    Bona Fide Business Arrangement Test–§ 2703(b)(1)

The Holman family limited partnership was created to maintain family control over family assets, coordinate investment management, protect family assets from future creditors and other third parties, and to educate the Holman children as to wealth management. See ante at 3-4. To aid in achieving these goals, the partnership agreement includes transfer restrictions and a right of first refusal (the "restrictions"). The agreement also grants the general partners, Thomas and Kim Holman, exclusive control over the partnership's business, including the power to determine the investments and investment strategy of the partnership.

Despite conceding that the partnership agreement's restrictions "aid in control of the transfer" of partnership interests, Holman v. Commissioner, 130 T.C. 170, 194 (2008), the Tax Court concluded that the provisions did not satisfy § 2703(b)(1)'s "bona fide business arrangement" test. After reviewing case law and § 2703's legislative history, the Tax Court reasoned that partnership restrictions aimed at maintaining family control over a partnership and its assets do not serve a "bona fide business purpose" where, as here, "the partnership carried on little activity other than holding shares of [publicly-traded stock]." Id. Moreover, the Tax Court concluded that § 2703(b)(1)'s legislative history did not list educating children or preventing children from dissipating family assets as legitimate business purposes. Id. at 195.

As a preliminary matter, I disagree with the court majority's decision to review the Tax Court's application of § 2703(b)(1) for clear error based on its conclusion that "[t]he ultimate question of whether there was a bona fide business arrangement is a question of fact." Ante at 9-10. To be sure, the ultimate determination of whether restrictions are bona fide business arrangements is likely a question of fact. However, the fundamental question before us is whether the Tax Court employed the correct criteria, framework, or test to make this factual determination. This is a question of law, subject to de novo review. Cf. Estate of Palmer v. Comm'r, 839 F.2d 420, 423

-22-

(8th Cir. 1988) (while "the ultimate determination of fair market value is a finding of fact . . . [t]he question of what criteria should be used to determine value is a question of law"); IHC Health Plans, Inc. v. Comm'r, 325 F.3d 1188, 1193 (10th Cir. 2003) ("The appropriate legal standard for determining whether an organization operates for a 'charitable' purpose is a legal question, which we review de novo.").  Moreover, this question requires a review of the Tax Court's interpretation of § 2703(b)(1), and we review the Tax Court's statutory interpretations de novo.  Scherbart v. Comm'r, 453 F.3d 987, 989 (8th Cir. 2006).  Thus, we are presented with *at least* a mixed question of law and fact, if not a pure question of law.  Either way, our precedent requires de novo review.  Blodgett v. Comm'r, 394 F.3d 1030, 1035 (8th Cir. 2005).

While interpreting § 2703(b)(1), our ultimate goal is to "give effect to the Congressional intent behind the statute's enactment."  Estate of Farnam v. Comm'r, 583 F.3d 581, 584 (8th Cir. 2009).  Where, as here, the statute's language is ambiguous,[7] it is appropriate to examine legislative history to determine legislative intent.  Id.  In light of § 2703(b)(1)'s legislative history, the court's interpretation and application of § 2703(b)(1) does not give effect to the statute's legislative intent.

The court, like the Tax Court, essentially holds that "maintaining family control" is a legitimate business purpose for partnership restrictions *only* when the "control" being preserved is the right to manage an operating business or an actively-managed asset.  See ante at 10-11.  While the court narrowly reads Estate of Bischoff v. Commissioner, 69 T.C. 32, 39-41 (1977) to bolster its holding, congressional committees cited Bischoff to support much broader propositions.  First, the Joint Committee on Taxation cited Bischoff for the proposition that maintaining family control is a legitimate business purpose for buy-sell agreements, "even when the

---

[7]The Tax Court noted that § 2703 "contains no definition of the phrase 'bona fide business arrangement,'" Holman, 130 T.C. at 192, and acknowledged that "[t]he meaning of the term 'bona fide business arrangement' . . . is not self apparent," id. at 195.  I agree.

'control' being preserved is a right to receive income from investment assets." Staff of Joint Comm. on Taxation, 101st Cong., 2d Sess., Federal Transfer Tax Consequences of Estate Freezes 14 (Comm. Print 1990). Furthermore, the parenthetical following the Committee's Bischoff citation explains that "maintenance of control is [a] business purpose even if the interest being sold is a limited partnership interest in a holding company." Id. at 14 n.44. Finally, the Senate Finance Committee cited Bischoff for the proposition that "[c]ontinuation of family ownership" is a legitimate business purpose for buy-sell agreements "even when the 'control' being preserved is only the right to participate as a limited partner." Explanatory Material Concerning Committee on Finance 1990 Reconciliation Submission Pursuant to House Concurrent Resolution 310, 136 Cong. Rec. 30,488, 30,538 (1990) [hereinafter Finance Committee Report]. Accordingly, I think the Holman partnership restrictions served the congressionally-recognized legitimate business purposes of maintaining family control over the right to participate as a limited partner and the right to receive income from the partnership's investment assets.

Next, the court attempts to distinguish the value-fixing agreement in Estate of Amlie v. Comm'r, 91 T.C.M. (CCH) 1017, 2006 WL 995337 (2006), from the restrictions in the present case. In Amlie, the Tax Court determined that a conservator's value-fixing agreement qualified as a bona fide business arrangement, in part, because it aided in "planning for future liquidity needs" of the ward's estate. Id. at *12. To support it's holding, the Tax Court in Amlie cited to a portion of the Finance Committee Report that provides:

> The committee believes that buy-sell agreements are common business planning arrangements and that buy-sell agreements generally are entered into for legitimate business reasons that are not related to transfer tax consequences. Buy-sell agreements are commonly used to control the transfer of ownership in a closely held business, to avoid expensive appraisals in determining purchase price, to prevent the transfer to an

-24-

unrelated party, to provide a market for the equity interest, and *to allow owners to plan for future liquidity needs in advance*.

Finance Committee Report, 136 Cong. Rec. at 30,539 (emphasis added); Amlie, 2006 WL 995337, at *12 (citing the same); see also Holman, 130 T.C. at 193-94 (quoting the same). Notably, the Tax Court recognized planning for future liquidity needs as a legitimate business purpose for the agreement despite the fact that the ward's stock "was not an actively managed business interest but merely an investment asset."[8] Amlie, 2006 WL 995337, at *12.

The court asserts that Amlie is distinguishable from the present case because the Holman partnership restrictions were not created to provide for the future liquidity needs of the partnership. This is a distinction without merit. Here, the Tax Court conceded that the Holman partnership restrictions aided in controlling the transfer of partnership interests to third parties. The court majority's attempt to distinguish the present case from Amlie ignores that the *same portion of legislative history* cited by the Tax Court in Amlie, and quoted by the Tax Court in the present case, recognizes that buy-sell agreements serve the legitimate business purpose of "prevent[ing] the transfer to an unrelated party." Finance Committee Report, 136 Cong. Rec. at 30,539. If the absence of an "actively managed business interest" was irrelevant in Amlie, it is unclear why an actively managed business interest is required in the present case to legitimize the Holman partnership restrictions.

In light of Amlie and § 2703(b)(1)'s legislative history, the Holman partnership restrictions serve the legitimate business purpose of protecting partnership assets from

---

[8]In Amlie, the Commissioner argued that the agreement could not satisfy § 2703(b)(1) unless the stock was an actively managed business interest. The Tax Court explained: "We rejected such an argument in Estate of Bischoff v. Commissioner, 69 T.C. 32, 40-41, 1977 WL 3667 (1977), and find it equally unpersuasive here." Amlie, 2006 WL 995337, at *12.

-25-

unrelated parties.[9]  Protecting partnership assets from creditors is surely a legitimate business purpose for transfer restrictions, regardless of whether the partnership manages an operating business or merely holds publicly-traded stock.  Cf. Estate of Mundy v. Comm'r, 35 T.C.M. (CCH) 1778, 1976 Tax Ct. Memo LEXIS 8, at *46 (1976) (finding that insulating corporate assets from possible liabilities was a valid business purpose for restricting transferability of stock).  Similarly, protecting partnership assets from the Holman daughters' potential future ex-spouses is a legitimate business purpose for the restrictions. Cf. Keller v. United States, No. V-02-62, 2009 WL 2601611, at *19 (S.D. Tex.  Aug. 20, 2009) (recognizing protecting family assets from depletion by ex-spouses through divorce proceedings as a "legitimate business purpose" for the creation and funding of a partnership).

Additionally, the Holman partnership restrictions serve the legitimate business purpose of preserving the partners' fundamental right to choose who may become a partner.[10]  See In re Schick, 235 B.R. 318, 324 (Bankr. S.D.N.Y. 1999) (recognizing that, although arguably more important in the general partnership context, the right to

_____

[9]The Tax Court acknowledged that the Holman partnership agreement restrictions were intended, in part, to place "strong limitations on what the limited partners can do in assigning or giving away their interests to other people" and to provide a "'safety net' if an impermissible person obtained an assignment of a limited partner interest from one of the girls."  Holman, 130 T.C. at 194 (quotation omitted). Indeed, the partnership agreement provides that the Holman partnership was created to "restrict the right of non-Family persons to acquire interests in Family Assets" and to "provide protection to Family Assets from claims of future creditors against Family members."  Id. at 176.  Moreover, at trial, Thomas Holman testified:  "[W]e were worried that the assets that the girls would eventually come into would be sought after by third-party people, friends, spouses, potential creditors."

[10]At trial, Thomas Holman explained that the partnership allowed the Holmans "to give [their] daughters a seat at the table, to become real partners in the operation of [the] business."  Moreover, one of Thomas Holman's long-term goals was to have his daughters "become more and more engaged in the partnership over time."

choose partners "still provides the underlying rationale for restricting the admission of new or substitute limited partners").  As the Holmans' partnership expert explained:

> Partnership agreements contain [transfer] restrictions because persons who join together as partners generally desire a high degree of certainty as to who their partners are and will be, especially where they establish the entity with commonly-shared investment goals and the intention that the entity be closely-held.  They want the ability to limit who may become their partner without their agreement that such person may take a place at the table.

Without restrictions on who may become a limited partner, Thomas and Kim Holman, as general partners, could find themselves owing obligations[11] and fiduciary duties to third parties to whom they never envisioned owing such obligations and duties–e.g., the Holman daughters' future spouses.  Such obligations and duties exist regardless of whether the Holman limited partnership operates a lemonade stand or holds Dell stock.  And, as the Holmans' partnership expert explained, "[h]aving an unwanted partner or assignee of a partnership interest is likely to increase the general partner's risk of personal liability."

Finally, I think the court's decision is contrary to the underlying purposes of § 2703.  Section 2703 is one of several special valuation rules Congress enacted, in part, "to allow business owners who are not abusing the transfer tax system to freely engage in standard intrafamily transactions without being subject to severe transfer tax consequences."  Finance Committee Report, 136 Cong. Rec. at 30,538.  Congress enacted § 2703, in particular, to "distinguish between agreements designed to avoid estate taxes and those with legitimate business agreements."  Id. at 30,539. This

---

[11]For example, section 6.1 of the Holman partnership agreement provides: "The General Partners shall use their best efforts to carry out the purposes and business of the Partnership in a prudent and businesslike manner."

legislative history suggests that the bona fide business arrangement test was designed to determine whether restrictions are created primarily to avoid transfer taxes.

Here, the Tax Court made the express factual determination that the partnership agreement restrictions were "designed *principally*" to protect family assets from dissipation by the Holman daughters. Holman, 130 T.C. at 195 (emphasis added). In other words, the Tax Court determined that the restrictions were designed primarily to serve a *non-tax* purpose. Notably, the Tax Court did *not* find that the Holmans merely paid lip service to legitimate business purposes for the restrictions while, in reality, using the restrictions for the primary purpose of avoiding taxes.[12] Additionally, the Tax Court did *not* find that the restrictions failed to match the partnership's legitimate, non-tax goals.[13] The underlying purposes of § 2703 are not served where, as here, the bona fide business arrangement test is applied in a manner that discourages partners in family partnerships from creating restrictions principally to achieve non-tax, economic goals.

---

[12]While the Tax Court determined that Thomas Holman understood the tax benefits of creating a partnership, it did not determine that tax avoidance was the principal purpose of the partnership restrictions. Indeed, understanding tax benefits and using transfer restrictions for the primary purpose of avoiding taxes are two different things.

[13]The court majority states that restrictions on the sale or use of property, "[w]hen carefully crafted and applied in certain circumstances . . . can minimize the tax consequences of gifts or transfers without imposing substantial additional limitations on the transferability or use of the property." Ante at 7. Here, however, there is apparently no question that the Holman partnership restrictions imposed actual, substantial limitations on the transfer of partnership interests. Indeed, even the Commissioner's expert recognized that "[i]n virtually every material respect" the Holman partnership agreement "blocks for 50 years the limited partners' ability to sell or use their respective limited partner interests." Holman, 130 T.C. at 197.

-28-

Thus, I would hold that the Holman partnership agreement restrictions are "bona fide business arrangements" because they were not created for the primary purpose of avoiding taxes, and they served the following legitimate business purposes: (1) maintaining family control over the right to participate as a limited partner; (2) maintaining family control over the right to receive income from the partnership's investment assets; (3) protecting partnership assets from creditors and potential future ex-spouses; and (4) preserving the partners' fundamental right to choose who may become a partner.

## B.    Device Test–§ 2703(b)(2)

Having determined that the partnership restrictions satisfy § 2703(b)(1), I now turn to § 2703(b)(2)'s "device" test.   Under this test, the Holman partnership restrictions must not be a "device to transfer such property to *members of the decedent's* family for less than full and adequate consideration in money or money's worth." I.R.C. § 2703(b)(2) (emphasis added).   Treasury Regulation § 25.2703-1(b)(1)(ii) excises the phrase "members of the decedent's family" found in § 2703(b)(2) and substitutes in its place the phrase "natural objects of the transferor's bounty," apparently because the Secretary of the Treasury interprets § 2703(b)(2) to apply to both inter vivos transfers and transfers at death.  Holman, 130 T.C. at 195-96. Applying this regulation, the Tax Court held that the Holman partnership restrictions operate as a device to transfer property to the natural objects of the Holmans' bounty. The Holmans argue that Treasury Regulation § 25.2703-1(b)(1)(ii) is invalid because it fails to give effect to § 2703(b)(2)'s plain language.  I agree.

The validity of a treasury regulation is a question of law, which we review de novo.  Walshire v. United States, 288 F.3d 342, 345 (8th Cir. 2002).  We afford treasury regulations interpreting the Internal Revenue Code "substantial deference." Mayo Found. for Med. Educ. & Research v. United States, 568 F.3d 675, 679 (8th Cir. 2009). That said, our first question in reviewing an agency's interpretation of a statute

is "whether Congress has directly spoken to the precise question at issue." Chevron, U.S.A., Inc. v. Natural Res. Def. Council Inc., 467 U.S. 837, 842 (1984). If so, we, "as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 843. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id.

The parties primarily dispute whether § 2703(b)(2) is ambiguous. The Holmans assert that the term "decedent" unambiguously refers to a deceased person and, therefore, § 2703(b)(2) asks only whether restrictions operate as a device to transfer property to family members at death. The Holmans point out that only the term "decedent," not the broader term "transferor," is used throughout § 2703(b)(2)'s legislative history. Conversely, the Commissioner argues that the term "decedent" is ambiguous due to § 2703's location in the Internal Revenue Code. Specifically, § 2703 is located in Subtitle B of the Code, which includes three transfer taxes–the estate, gift and generation-skipping transfer taxes. More precisely, § 2703 is located in Subtitle B, Chapter 14. In Chapter 14, § 2703 joins a set of special valuation rules targeting transfer tax avoidance schemes.

It is clear that the phrase "members of the decedent's family" unambiguously limits § 2703(b)(2)'s application to transfers at death. First, the term "decedent" is itself unambiguous. Black's Law Dictionary 465 (9th ed. 2009) plainly defines "decedent" as "[a] dead person." Moreover, the phrase "members of decedent's family" is not ambiguous when read in the greater context of Chapter 14. While Congress used the term "decedent" in § 2703(b)(2), it used the broader term "transferor" in Chapter 14's other valuation statutes. See I.R.C. §§ 2701(a)(1) & 2702(a)(1). And, as the Holmans point out, the term "decedent" consistently appears in § 2703(b)(2)'s legislative history. Finally, I find it telling that members of Congress have failed in their attempts to amend § 2703(b)(2) by substituting the legislative phrase "members of the decedent's family" with the Commissioner's phrase "natural

objects of the transferor's bounty." See Smith v. United States, No. C.A. 02-264 ERIE, 2004 WL 1879212, at *6 n.3 (W.D. Pa. June 30, 2004). Thus, although Congress enacted Chapter 14 to generally address transfer tax avoidance schemes, § 2703(b)(2) applies specifically to transfers at death.

Therefore, Treasury Regulation § 25.2703-1(b)(1)(ii) is invalid because it does not give effect to the plain language of § 2703(b)(2). Since the Holmans are living persons, they are, by definition, not "decedents" and § 2703(b)(2)'s device test is satisfied.

## C.  Comparable Terms Test–§ 2703(b)(3)

Since the Holman partnership restrictions satisfy § 2703(b)(1) and (2), I now analyze the restrictions under § 2703(b)(3). Under § 2703(b)(3)'s "comparable terms" test, the Holman partnership restrictions' terms must be "comparable to similar arrangements entered into by persons in an arms' length transaction." While the Tax Court did not decide whether the restrictions satisfied the comparable terms test, it noted that both parties' experts "agree that transfer restrictions comparable to those found in [the Holman partnership agreement] are common in agreements entered into at arm's length."[14] Holman, 130 T.C. at 198-99. The Tax Court explained that this "would seem to be all that [the Holmans] need to show to satisfy section 2703(b)(3)." Id. at 199. I agree, and I would hold that the Holman partnership restrictions satisfy § 2703(b)(3)'s comparable terms test.

---

[14]The court in footnote 5 appears to import language from one of the Commissioner's experts to impeach the Tax Court's statements concerning the requirements of § 2703(b)(3). At best, the cited emanations of this particular witness are barely relevant to a proper interpretation of this portion of the statute.

Thus, because the partnership restrictions satisfy all three of § 2703(b)'s tests, I would reverse and remand to the Tax Court for a valuation of the limited partnership interests that does not disregard the partnership restrictions.

## II.    MARKETABILITY DISCOUNT CALCULATION

As a preliminary matter, I also disagree with the court's decision to review the Tax Court's marketability discount calculation for clear error.  "The mathematical computation of fair market value is an issue of fact, but determination of the appropriate valuation method is an issue of law that we review de novo."  Estate of Jelke v. Comm'r, 507 F.3d 1317, 1321 (11th Cir. 2007) (quotation and alteration omitted); see also Palmer, 839 F.2d at 423 (the "question of what criteria should be used to determine value is a question of law subject to de novo review").  Since the real issue here is whether the Tax Court used a proper valuation method–i.e., properly applied the willing buyer/willing seller test to calculate an appropriate marketability discount, I would review this legal issue de novo.

Under Treasury Regulation § 25.2512-1, the value of property for gift tax purposes is "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts."  While the hypothetical willing seller and willing buyer "are presumed to be dedicated to achieving the maximum economic advantage," Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990), "the Commissioner  cannot tailor 'hypothetical' so that the willing seller and willing buyer [are] seen as the particular persons who would most likely undertake the transaction."  Morrissey v. Comm'r, 243 F.3d 1145, 1148 (9th Cir. 2001) (internal quotation omitted).

While assessing the partnership interests' marketability for valuation purposes, the Tax Court conceded that the private market for such interests was "thin." Holman,

130 T.C. at 214. However, the Tax Court adopted the opinion of the Commissioner's expert that this "thin" market did not justify a substantial marketability discount because the wishing-to-assign partner could convince the remaining partners to voluntarily dissolve the partnership and buy him out. Specifically, the Tax Court reasoned:

> [G]iven the significant minority interest and marketability discounts from an LP unit's proportional share of the partnership's [net asset value] that each expert would apply in valuing the gifts, it would appear to be in the economic interest of both any limited partner not under the economic necessity to do so but wishing to make an impermissible assignment of LP units and the remaining partners to strike a deal at some price between the discounted value of the units and the dollar value of the units' proportional share of the partnership's [net asset value]. The wishing-to-assign partner would get more than she would get in the admittedly 'thin' market for private transactions, and the dollar value of each remaining partner's share of the partnership's [net asset value] would increase.

Id. at 214.

The Tax Court's analysis violates the hypothetical willing buyer/willing seller test because it assumes the *hypothetical* buyers own Holman limited partnership interests. See Estate of Jung v. Comm'r, 101 T.C. 412, 438 (1993). The court majority asserts that the Tax Court properly cast the hypothetical willing buyer "*merely* as a rational economic actor," but the Tax Court did more than that. Ante at 20 (emphasis added). The Tax Court effectively plucked rational economic actors out of the existing "thin" private market,[15] placed Holman limited partnership shares in their pockets, and asked them what they would pay for a wishing-to-assign partner's

---

[15]A rational actor "seeks to maximize his advantage in the context of the *market* that exists at the date of valuation." Estate of Jameson v. Comm'r, 267 F.3d 366, 370 (5th Cir. 2001) (emphasis added).

-33-

interest in light of the partnership's dissolution provisions.  In fact, the Tax Court's analysis is essentially based on the idea that a *mere* rational economic actor in the existing market would pay *less* than rational actors who already hold Holman limited partnership interests.[16]  Courts commit legal error where, as here, they substitute hypothetical buyers for "particular possible purchasers" based on "imaginary scenarios as to who a purchaser might be."  Estate of Simplot v. Comm'r, 249 F.3d 1191, 1195 (9th Cir. 2001).

That is not to say that courts err whenever they consider partnership agreements' dissolution provisions while calculating an appropriate marketability discount.  For example, if the Holman limited partnership had a significant history of dissolving and buying out wishing-to-assign partners, a hypothetical willing buyer would consider this fact while assessing the partnership interests' marketability.  See, e.g., Estate of Neff v. Comm'r, 57 T.C.M. (CCH) 669, 1989 Tax Ct. Memo LEXIS 278, at *27 (1989) (determining that "the hypothetical willing buyer would certainly take into account the [corporation's history of] stock repurchases, at premium prices, in valuing the stock").  Indeed, hypothetical willing buyers and willing sellers are considered to have "reasonable knowledge of relevant facts" surrounding the hypothetical sale.  Treas. Reg. § 25.2512-1.

Here, the Commissioner's expert never determined the actual likelihood of the Holman limited partnership executing a dissolution and buy-out scheme.  Holman, 130 T.C. at 214.  The expert merely opined that he could not "envision an economic reason why" the partnership would not engage in such a scheme.  Id.  (quotation

---

[16]The Tax Court reasoned that the remaining partners and the wishing-to-assign partner could "strike a deal *at some price between the discounted value of the units* and the dollar value of the unit's proportional share of the partnership's [net asset value]" and, as a result, "[t]he wishing-to-assign partner *would get more than she would get in the admittedly 'thin' market for private transactions*."  Holman, 130 T.C. at 214 (emphasis added).

omitted). This analysis is not helpful because it does not consider the fact that the Holman limited partnership has never engaged in such a scheme, see Jung, 101 T.C. at 437 n.9, or whether the Holman limited partnership or limited partnership owners do or do not have sufficient liquidity to buy out a wishing-to-assign partner. The expert's analysis also does not consider that dissolving and buying out a wishing-to-assign partner may be contrary to the partnership's stated goals–maintaining control of family assets, continuing ownership of family assets, and restricting the ability of unrelated parties to acquire interests in family assets. Against this factual backdrop, the hypothetical willing buyer may find that the actual probability of the remaining partners unanimously consenting to a dissolution and buy-out scheme is quite low.

Thus, the Tax Court's misapplication of the willing buyer/willing seller test constitutes reversible error. Accordingly, I would also reverse and remand to the Tax Court for a new marketability discount determination.

For the foregoing reasons, I respectfully dissent.

_____